**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JASEY MIKELS,
Plaintiff-Appellant,

v.                                                                              No. 96-2560

CITY OF DURHAM, North Carolina,
Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-95-261-1)

Argued: April 8, 1998

Decided: June 29, 1999

Before WILLIAMS, Circuit Judge,
PHILLIPS, Senior Circuit Judge, and
G. ROSS ANDERSON, JR., United States District Judge
for the District of South Carolina, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Phillips wrote the opin-
ion, in which Judge Williams and Judge Anderson joined.

_____

**COUNSEL**

**ARGUED:** R. Hayes Hofler, III, HAYES HOFLER & ASSO-
CIATES, P.A., Durham, North Carolina, for Appellant. Reginald B.
Gillespie, Jr., FAISON & GILLESPIE, Durham, North Carolina, for
Appellee. **ON BRIEF:** Laurel E. Solomon, HAYES HOFLER &

ASSOCIATES, P.A., Durham, North Carolina, for Appellant. Keith D. Burns, FAISON & GILLESPIE, Durham, North Carolina, for Appellee.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Jasey Mikels appeals the district court's entry of summary judgment for defendant City of Durham ("City") on her Title VII and § 1983 "hostile environment" sexual harassment claims. The district court dismissed both claims, concluding that once made aware of the allegedly harassing conduct, the City had taken prompt and adequate remedial measures to relieve it of liability under Title VII and that the City did not have a custom or policy which caused the conduct so as to make it liable for that conduct on the § 1983 claim. We affirm.

I.

The essential facts of the case, either undisputed or, where disputed, recited in the light most favorable to Mikels as nonmovant on the summary judgment record, are as follows. Mikels began work as a police officer for the City in May 1988. Around midnight on March 28-29, 1993, while both were on duty as members of Squad 2D, Corporal Robert Acker grabbed Mikels on each side of her face, pulled her to him, and kissed her on the mouth. This unwelcome act was preceded by several seconds of "shadow boxing" in which Acker repeatedly jabbed at Mikels' face without actually hitting her. Immediately after Acker kissed her, Mikels pushed him away and demanded that he never touch her again. Mikels expressed her displeasure in clear and certain terms and Acker immediately apologized. Mikels did not accept the apology.

This incident occurred in the presence of several other police officers, including Mikels' and Acker's immediate supervisor, Sergeant Robert Cox. Cox did not immediately respond, but after a few moments, he came over, put his hand on Mikels' shoulder, and stated "he apologizes, she accepts, it's over with." Shortly afterward and

2

during that shift, Cox privately issued an oral reprimand and warning to Acker, advising him that the conduct was inappropriate, would not be tolerated and if repeated would subject him to more severe punishment. During a follow-up meeting with Mikels in which Cox advised her of his having reprimanded Acker, Mikels repeated her objection to the conduct and told Cox of an incident some five months before in which Acker had made unwelcome sexually suggestive bodily contact with her. This was her first report of the earlier incident. During the next work shift on March 29-30, Cox reported the March 28-29 kissing incident to his immediate supervisor, Captain Rigsbee, and by Rigsbee's direction issued a formal reprimand and warning to Acker in the form of a written memorandum confirming those earlier given orally. In this memorandum, Cox characterized the incident as "horseplay" but as conduct violative of departmental rules and regulations which if repeated would "lead to stricter disciplinary action," and he incorrectly stated (as later determined on conflicting evidence in an internal review process) that Mikels had accepted Acker's immediate apology. Cox also met with the entire 2D squad and warned that horseplay, practical joking and the like would not be tolerated in the future, and Cox and Rigsbee met with the four female members of the squad other than Mikels to discuss the incident and to determine whether and to what extent they had experienced or observed comparable conduct.

During the March 29-30 shift, Mikels told Cox that she was filing a formal administrative complaint respecting the kissing incident. Cox advised her against doing so, suggesting, according to Mikels, that she would "regret it." Mikels nevertheless filed her complaint with the Internal Affairs Division of the Department on March 30. And, when Acker then reported for duty on April 2, he was summoned to Police Headquarters and placed on administrative leave with pay for two months. During this period of leave, he was transferred to another squad effective upon his return from leave.

Following an extensive internal investigation of Mikels' complaint, the investigating officer prepared a report and recommendation which was forwarded for action to Police Chief Jackie W. McNeill. Acting upon the report, Chief McNeill found that Acker's conduct in the March 28-29 incident violated the City's sexual harassment policy and constituted conduct unbecoming a police officer in violation of

3

Department regulations. McNeill ordered a two-week suspension without pay, reduction in rank, transfer to another department, and corrective counseling.

Acker appealed this disciplinary action through employee grievance procedures. A five-member Police Department Board of Inquiry conducted a new evidentiary hearing. Following its own review, the Board concurred in Chief McNeill's recommendations, affirming his findings that Acker had violated the City's sexual harassment policy and the Department regulations respecting officer conduct.

Acker appealed again, this time exercising his final administrative option: review by the City Manager's Office. Assistant City Manager Cecil A. Brown conducted a hearing on Acker's grievance. Following the hearing and a review of internal affairs reports, on December 20, 1993, Brown, citing various steps in the internal departmental review process that he asserted were irregular, affirmed the imposition of a formal reprimand of Acker, but set aside the Board-approved further sanctions of demotion and pay reduction as unauthorized under Department procedures. The net effect of this final administrative action was to let stand the formal reprimand and warning imposed by Cox and the administratively ordered transfer of Acker to another squad, but to restore Acker to his pre-incident rank and pay-grade.

Following Cox's oral reprimand and warning of Acker immediately after the March 28-29 incident, neither Acker nor any other member of the Department engaged in any form of sexual harassment of Mikels. Acker and Mikels served together in squad 2D on only one shift following the March 28-29 incident. Upon Acker's return to active duty from the two-month's administrative leave that was imposed following the filing of Mikels' internal complaint, he and Mikels were in different squads, operating in different areas and on different work schedules as a result of Acker's administratively ordered transfer. They saw each other from time to time, but had no personal contact while on duty.

Mikels' filing of a formal complaint did, however, arouse great resentment on the part of some of her fellow officers, male and female, that caused her working conditions to become increasingly unpleasant. Some fellow officers openly voiced their resentment;

4

some belittled the merits of her complaint, suggesting that she had effectively invited Acker's conduct by her own participation in similar conduct; some gave her the "silent treatment;" some refused to answer her calls for assistance. Some of her superiors were similarly resentful of what they considered her creation of trouble within the Department; one urged her to transfer from Squad 2D to escape the unpleasantness she was experiencing in that setting. Eventually, in December 1994, she did request and obtain a transfer to another squad where for a time her working conditions improved. This did not last, however, and she began increasingly to call in sick to escape the unpleasantness of her working conditions. Finally, because of her continued distress resulting from the unpleasantness which began with the March 28-29 kissing incident, she resigned from her employment in October 1995, claiming psychological problems resulting from the course of events triggered by the March 28-29, 1993 incident.

On January 6, 1994, shortly after Brown's final decision reducing the disciplinary sanctions imposed upon Acker, Mikels filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"). In it, she identified as the only basis of her charge Acker's March 1993 conduct and Brown's December 1993 decision, which she characterized as one that "exonerated[Acker] of all wrongdoing" and that found him "not guilty of sexual harassment."

Following the EEOC's issuance of a right-to-sue letter, Mikels commenced this action against the City, alleging parallel federal claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983, and a number of pendent state-law tort claims.**1** The gravamen of her Title VII claim was that Acker's March 28-29, 1993, conduct was sexual harassment creating an "abusive or hostile workplace environment" for which the City was liable by reason of its failure to take prompt and adequate remedial measures respecting that conduct.**2** The gravamen of the § 1983 claim

_____

**1** These pendent claims, along with a prayer for punitive damages in relation to all claims, were dropped by Mikels during pre-trial proceedings and are not involved in the appeal.
**2** It is important at this point to note the exact scope of the Title VII sex discrimination claim alleged by Mikels. As fixed by her EEOC charge

5

was that Acker's conduct was effectively caused by a City policy or custom which encouraged or acquiesced in such conduct by its employees.

In addition to denying essential elements of both federal claims, the City raised a statute of limitations defense to the Title VII claim, alleging untimely filing of the predicate EEOC charge.

Following extensive discovery, the district court granted the City's motion for summary judgment as to both the Title VII and § 1983 claims. Though the court opined that the Title VII claim "may be barred by the applicable statute of limitations," it declined to dismiss the claim on that basis, but did so instead on the basis that, under Fourth Circuit precedent, the City's remedial response to Acker's March 28-29, 1993, conduct was, as a matter of law, sufficiently prompt and adequate to relieve it of any potential liability for that conduct. And, it dismissed the § 1983 claim on the basis that, as a matter of law on the undisputed facts, the City had no policy or custom which could be considered the effective cause of Acker's challenged conduct.

This appeal by Mikels followed.

II.

We review de novo the district court's grant of summary judgment dismissing both the Title VII and § 1983 claims, see Ballinger v.

_____

and then alleged in her complaint, it concerned only Acker's conduct on March 28-29, 1993, (and conceivably the one earlier incident first reported following that of March 28-29) and the City's remediation responses to that conduct, culminating in Brown's final administrative decision concerning the March 28-29 incident. For this reason, Mikels' proffered evidence of post-incident hostility of fellow-employees and superiors with resulting emotional distress and eventual resignation could have relevance to that claim only as it might be probative of compensatory damages traceable to the charged violation. Her complaint does not allege separate Title VII claims of retaliation or constructive discharge and, by her own account, any hostility she experienced following the charged incident was not because of her sex (or "sex" in general) but because of the resentment of some at her having filed a complaint which they thought unwarranted.

6

North Carolina Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987), and take them in turn.

A.

(1)

Addressing the Title VII claim, we first decline, as did the district court, to rule on the statute of limitations defense which the City continues to press on appeal as an alternative basis for affirmance. Though the district court suggested cogent reasons why the defense might be a valid one, we believe, as did that court, that the limitations issues need not, and in prudence should not, be addressed in this case.[3] We therefore proceed to the merits of Mikels' claim.

_____

[3] As the district court noted, Mikels' EEOC filing on January 6, 1994, was untimely under the basic 180-day limitation period of 42 U.S.C. § 2000e-5(e)(1) unless the "unlawful employment practice" being charged was properly considered to be Brown's December 20, 1993, sanction-reducing decision rather than the March 28-29, 1993, incident, or unless Mikels properly had invoked the extended 300-day limitation period available in "deferral states" such as North Carolina. See id. As to the first possibility, the court apparently assumed it obvious that the triggering occurrence was the March 28-29, 1993, incident, rather than Brown's December 20, 1993, sanction-reducing decision. As to the second, the court indicated the view that Mikels had not properly invoked the 300-day period by "initially institut[ing] proceedings with a [proper] State or local agency," id., because the Police Department's Internal Affairs Division was not such an agency.

The court then merely noted, without addressing their merits, that Mikels also sought to avoid the limitations bar of 42 U.S.C. § 2000e-5(e) by invoking "continuing violation" and "estoppel" tolling principles.

The question raised by Mikels' contention that accrual of a sexual harassment claim may be deferred by continuing developments in an employer's remediation response appears to be one of first impression. The uncertainties and opportunities for manipulation that would be created were the contention upheld would seem at first blush to make it a highly doubtful one. But claim-accrual doctrine, dependent as it is upon determining when all of a claim's elements have occurred, is sufficiently arguable in its application to this particular claim to counsel reservation of the issue for another day when its resolution cannot be avoided--as it can be here.

7

(2)

As earlier noted, the district court dismissed the claim on the basis that on the undisputed facts of record it failed as a matter of law under directly controlling circuit precedent. At the time, our most recent precedent defined the elements of the "hostile or abusive work environment" claim recognized in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), and Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), as being that "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995). And, our precedents had long defined the basis for imposing liability under element (4) as being that after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer had taken "no prompt and adequate remedial action [to correct it]." Id. at 710 (quoting Swentek v. USAIR, Inc., 830 F.2d 552, 558 (4th Cir. 1987) (quoting Katz v. Dole, 709 F.2d 251, 255 (4th Cir. 1983))); Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir. 1989) (quoting Swentek, 830 F.2d at 558 (quoting Katz, 709 F.2d at 255)), vacated and remanded on other grounds, 900 F.2d 552 (4th Cir. 1990). **4**

_____

**4** It is now settled that this failure-to-act-after-notice standard is one for imposing Title VII liability on employers for their direct negligence rather than on respondeat superior or other"imputed" liability principles. See Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2267 (1998) (so characterizing standard as deriving from employer negligence principle stated in Restatement (Second) of Agency§ 219(2)(b)); Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2288-89 (1998) (categorically rejecting respondeat superior as basis for imposing employer liability because sexual harassment not within scope of employment). To the extent we have sometimes characterized the standard as one for imposing respondeat superior liability, see Katz, 700 F.2d at 255 ("some theory of respondeat superior"), our characterization has been revealed to be an incorrect one, but no more than that. The mischaracterization has had no substantive effect on our application of the standard. Cf., Fleenor v. Hewitt Soap Co., 81 F.3d 48, 49-50 (6th Cir. 1996) (noting and correcting similar mischaracterization of standard in previous decisions).

8

Treating element (4) as dispositive, and addressing only it, the district court ruled that on the undisputed facts of record, the City had, as a matter of law, taken prompt and adequate remedial action to correct the harassing conduct charged by Mikels, and was therefore not liable for it. Specifically, the court pointed to the actions of Cox in promptly reprimanding and warning Acker, first orally then formally in writing for the record, in quickly convening the entire squad to forbid further "horseplay" such as Acker's at peril of disciplinary sanctions, and in promptly reporting the conduct to his supervisor, Rigsbee; to Rigsbee's prompt ordering of an investigation and his directing Acker's official reprimand; and to Acker's two-months' suspension from duty and reassignment to a different squad upon his return to duty. And, the court pointed out that "perhaps most importantly" under our precedents, there had been no reports of any further harassing conduct by Acker (or anyone else in the Department) following the remedial actions taken by City officials. See Spicer, 66 F.3d at 711 (holding that "when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well"); see also Swentek, 830 F.2d at 558 (treating as probative of adequacy of remedial response the fact that following reprimand no further complaints were made against alleged harasser).

We agree with the district court's ruling that under our precedents the remedial responses made by City officials to Acker's conduct were sufficiently "prompt and adequate" to relieve the City of potential liability for that conduct. In so holding, we agree with the court's rejection of two principal challenges to its ruling, which Mikels continues to press on this appeal.

In her principal challenge, she contends that even if the initial remedial responses were considered "adequate" when made, they later were completely undercut by Brown's sanction-reducing decision. Rhetorically characterizing that decision as a "complete exoneration" of Acker, she argues in effect that by reducing the effectiveness of the initial response to zero, it made the overall response inadequate as a matter of law.

In rejecting this contention, the district court noted that Brown's decision--however motivated and even if legally erroneous--had no effect upon the official reprimand and warning directed by Rigsbee,

9

upon Acker's reassignment to another squad upon his return to duty, nor upon his two-months' suspension from duty. These"residual effects," coupled with the critical fact that the conduct ceased, sufficed to demonstrate that the overall response was prompt and adequate.

We agree with that assessment. We have not required that particular remedial responses be the most certainly effective that could be devised, see Spicer, 66 F.3d at 710, and have given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question. See id. at 710-11 (holding that immediate action taken to prevent posting of sexually offensive memorandum, counseling greater sensitivity by its authors, and warning that inappropriate sexual remarks would not be tolerated, after which no further offensive conduct occurred, was adequate remedial response as a matter of law); Swentek, 830 F.2d at 558 (holding same as to prompt investigation of charges followed by written reprimand and warning, after which "no further complaints were lodged").

In a closely related contention, Mikels argues that under our decision in Paroline, Brown's action in significantly reducing the sanctions sufficed to raise a genuine issue of material fact, precluding summary judgment, as to whether the overall course of remedial action taken was but a "sham," hence inadequate. The district court held that Paroline was distinguishable on the "sham" point, and we agree.

In Paroline, the evidence as forecast on the summary judgment record showed that well before Paroline, the Title VII claimant, had been employed by Unisys, the employer-defendant, Unisys had been put on notice that Moore, Paroline's eventual supervisor, had been sexually harassing other female employees. See Paroline, 879 F.2d at 103. At that time, Unisys management did nothing but convene a staff meeting to instruct male staff members to avoid conduct that might be considered sexual harassment and privately caution Moore to desist. See id. Having done that, management officials openly joked and made light of female employees' sexual harassment complaints and Moore did not cease his harassing conduct. See id. When Paroline was later employed, Moore quickly turned his attentions to her, engaging in overtly offensive sexual harassment. See id. When Paro-

10

line as quickly complained to management officials, they acknowl-
edged to her their previous awareness of Moore's behavior and then
gave him a written reprimand and warning, directed him to seek coun-
seling, and advised him to limit his contact with female employees.
See id. Advised of the action taken, Paroline protested its inadequacy.
See id. at 103-04. And, despite entreaties that she not do so, she
resigned from her employment less than a month after she had lodged
her complaint and less than four months after being employed. See id.
at 104.

In these circumstances, we held that there was sufficient evidence
as forecast to create a genuine issue as to whether all of Unisys'
asserted remedial responses--both those before and those after Paro-
line's complaint--had been mere "shams," hence not legally ade-
quate. See id. at 106-08. And, on that basis, we held, notwithstanding
that no more complaints against Moore had been lodged following
Paroline's, that summary judgment for Unisys was not proper. See id.

The critical distinction between the Paroline situation and that in
this case is the fact that in Paroline the employer was already on
notice, before Paroline's complaint, of the harasser's propensities, and
of the demonstrated inadequacy of mere verbal and written repri-
mands and warnings to deter him. From this, we concluded that based
on this prior history, a jury might reasonably find that the employer's
response following Paroline's complaint, like that following earlier
complaints, was equally ineffectual. Here, in contrast, there was no
prior history of demonstrably ineffectual, hence possibly "sham,"
responses to draw in question the adequacy of the overall remedial
response to Mikels' complaint.**5** We therefore agree with the district
court's rejection of Mikels' "sham response" contention.

_____

**5** This distinguishing fact also explains why the undisputed fact that
Moore's harassment of Paroline ceased following Unisys' remedial
action did not have the probative significance that cessation was
accorded in Spicer and Swentek. In those cases, causal connection
between response and cessation was considered established as a matter
of law, thereby confirming in the most obvious possible way the "ade-
quacy" or "effectiveness" of the response. See Spicer, 66 F.3d at 710
(noting that evidence of the "effectiveness of the response in eliminating
the problem" was "undisputed"); Swentek , 830 F.2d at 558 (assuming

11

(3)

While this appeal was pending, the Supreme Court, in <u>Burlington Industries v. Ellerth</u>, 118 S. Ct. 2257 (1998), and <u>Faragher v. City of Boca Raton</u>, 118 S. Ct. 2275 (1998), significantly clarified extant law respecting employer liability under Title VII for sexual harassment by its employees. Of possible relevance to Mikels' claim, the Court held that under the aided-by-agency principle expressed in Restatement (Second) of Agency § 219(2)(d), as "adapt[ed] to the practical objectives of Title VII," <u>Faragher</u>, 118 S. Ct. at 2290 n.3, "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee," <u>Ellerth</u>, 118 S. Ct. at 2270; <u>Faragher</u>, 118 S. Ct. at 2292-93. But only "subject to," not "automatically liable," because not all harassment even by supervisory personnel is necessarily "aided by the agency relation." <u>See</u> <u>Ellerth</u>, 118 S. Ct. at 2269 (noting that some acts of harassment by supervisor "might be the same acts a co-employee would commit" and that "there may be some circumstances where the supervisor's status makes little difference"). The fundamental determinant of this form of vicarious liability is not, therefore, the harasser's formal rank vis-a-vis that of the victim in the particular employment hierarchy, though that is of critical and sometimes decisive evidentiary importance, but whether the particular conduct was "aided by the agency relation." <u>See id</u>. Two bright-line rules define the boundaries of the root principle. Any harassing conduct that culminates in a "tangible employment action" against the victim is necessarily conduct "aided by the agency relation," since it can only be taken by supervisory employees empowered by their employer's to take such action. <u>See</u> <u>Ellerth</u>, 118 S. Ct. at 2268-69 (gives "assurance [that] the injury could not have been inflicted absent the agency relation"). In that circumstance, vicarious liability is absolute, without regard to whether the

_____

causal connection from undisputed fact that no further complaints about harasser were lodged following remedial response). In <u>Paroline</u>, by contrast, such a causal connection could not be considered to be evident as a matter of law, both because Paroline's resignation came too quickly to permit the conclusion and because previous remedial responses of the same kind had proven ineffectual to stop earlier harassment.

12

employer knew, or should have known, or approved of the act, or sought to prevent or stop it. See Faragher, 118 S. Ct. at 2284-85, 2293; see also Ellerth, 118 S. Ct. at 2269. At the other end, "absent some elaborate scheme," harassment by a fellow-employee having no authority of any kind over the victim never can be found "aided by the agency relation"; as to such employees, the agency relation provides no "aid" for their conduct but workplace proximity, and that does not suffice for the purpose. See Ellerth , 188 S. Ct. at 2268. For such "unaided" harassment, by whomever done, employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it. See id. at 2267.

Between these extremes, there remains otherwise actionable harassment that, though it does not culminate in tangible employment action, is nevertheless "aided by the agency relation," as that may be demonstrated by other features of the employment relations between harasser, victim, and employer and the particular circumstances of its occurrence. Vicarious liability arising in this way is not absolute, but subject to an affirmative defense that the employer had (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the victim had "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." See Ellerth, 118 S. Ct. at 2770; Faragher, 118 S. Ct. at 2292-93. And as indicated, it can only arise from the conduct of an employer having some measure of supervisory authority over the victim; it cannot arise from the conduct of a mere co-worker, one with no form of authority.

Which leads to the possible relevance to Mikels' claim of the new regime announced in these intervening Supreme Court decisions. At the time Mikels' claim was litigated in the district court and her appeal briefed and argued in this court, our precedents applied the failure-to-act-after-notice standard as the sole basis for imposing liability upon employers for abusive or hostile workplace conditions whether caused by victims' co-workers or supervisors (at lower than "alter-ego" levels of management). See, e.g., Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261-62 (4th Cir. 1996) (applied where harasser was victim's immediate supervisor); Swentek, 830 F.2d at 557-58 (applied where harasser found not to be supervisor);

13

Katz, 700 F.2d at 253-56 (applied where both co-workers and supervisors were involved). In consequence, there was no reason prior to argument in this court for Mikels to raise any issue as to whether the City might be subject to vicarious liability under the more stringent aided-by-agency-relation principle if not directly liable under the failure-to-act-after-knowledge negligence principle. Though Mikels has not since submission of the case sought to raise the issue with us, as she might have by invoking Fed. R. App. P. 28(j) to suggest the Supreme Court decisions as relevant intervening authority, we think it proper to address the matter sua sponte in the interest of fairness. See Ellerth, 118 S. Ct. at 2271 (instructing that on remand, district court might consider justice of allowing Title VII claimant to re-plead and supplement discovery in light of newly-announced rule); cf. Reinhold v. Virginia, 151 F.3d 172, 176 (4th Cir. 1998) (on petition for rehearing; previous opinion applying pre-Ellerth/Faragher circuit precedents withdrawn, case remanded for reconsideration in light of Supreme Court decisions).

Here, we do not believe a vacatur and remand for reconsideration is warranted. Because Acker's conduct did not result in any tangible employment action, that means of establishing absolute vicarious liability would not be available. The only available theory would be that Acker's conduct was that of one with sufficient supervisory authority over Mikels that its doing under the circumstances was "aided by the agency relation." We are satisfied that, as a matter of law, this theory could not be established in the face of the record. Cf. Faragher, 118 S. Ct. at 2293 (remand for possible raising of newly-announced affirmative defense not warranted where "it appear[ed] from the record that any such avenue is closed").

Faragher and Ellerth, not having the issue directly before them, attempt no definitive explanation of what conduct short of that culminating in tangible employment action can be found nevertheless to be "aided by the agency relation." See Ellerth, 118 S. Ct. at 2269 (describing conduct so qualifying only as "less obvious"). We know that it cannot be the conduct of a mere co-worker--one having no form of authority over the victim--and that it therefore can only be the conduct of one having some measure of supervisory authority. But, because not all harassment even by "supervisory" employees necessarily qualifies under the "malleable terminology" of this stan-

14

dard, see id., the inquiry may have to run deeper into the details of relationships and particular circumstances. The touchstone, though not a prescription, can be found in critical observations by the Ellerth and Faragher courts respecting the way in which the agency relation may aid a particular "supervisor" in a particular act of actionable harassment. The determinant is whether as a practical matter his employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a mere co-worker would not. See Faragher, 118 S. Ct. at 2291 (because "victim may well be reluctant to accept the risks of blowing the whistle on a superior . . . [and]"generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker"). The most powerful indicator of such a threat-induced vulnerability deriving from the supervisor's agency relation lies in his authority, though not exercised in the particular situation, to take tangible employment actions against the victim, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See Ellerth, 118 S. Ct. at 2268-69 (so defining this level of authority as necessarily derived from the agency relation); Faragher, 118 S. Ct. at 2293 (imposing aided-by-agency vicarious liability where no tangible employment action taken but one of two harassing supervisors had authority to hire and fire, both had"virtually unchecked authority" over subordinates, "directly controlling and supervising all aspects of [the victim's] day-to-day activities," and victim and colleagues were "completely isolated from the [employer's] higher management").

Short of that most threatening form of supervisory authority, we may assume, without deciding here, that lesser forms derived from the agency relation may aid particular acts of supervisor harassment. In such less clear circumstances, the victim's response in context may be highly probative on the issue whether any agency authority possessed by the harasser has actually aided his conduct by increasing her sense of vulnerability and defenselessness. This point was anticipated, though obliquely, in Faragher. There the Court noted that "when a fellow-employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor `whose power to supervise--[which may be

15

to hire and fire], and to set work schedules and pay rates--does not disappear when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion.'" Id. at 2291 (quoting Estrich, Sex at Work, 43 Stan. L. Rev. 813, 854 (1991). Which is to suggest that where the level of authority had by a harasser over a victim--hence her special vulnerability to his harassment--is ambiguous, the tip-off may well be in her response to it. Does she feel free to "walk away and tell the offender where to go," or does she suffer the insufferable longer than she otherwise might?

In the face of these principles derived from Ellerth and Faragher and the facts of record, we are satisfied that Mikels would have no "serious prospect" of proving upon remand that Acker's conduct was aided by the agency relation in the required way. See Faragher, 118 S. Ct. at 2293 (similarly concluding as to prospect that employer could establish newly-announced affirmative defense were the case remanded). From the undisputed facts of record, informed by a modicum of judicial notice, it is evident that any authority possessed by Acker over Mikels was at best minimal. In the typical paramilitary structure of the Police Department he was, as Mikels put it, Appellant's Br. 3, only her "superior" in rank, he a corporal, she a private-level member of the same squad. In that position, Acker's authority assuredly did not include the power to take tangible employment actions against Mikels and her rank-peers. At most it would involve the occasional authority to direct her operational conduct while on duty. Importantly, the record is clear that in her relationships with Acker, she was not isolated from the continuing protective power of higher management in the Department. She operated under the stated understanding that her direct "supervisor" was her squad-leader sergeant, id. at 4, and, as the record plainly indicated, she had immediate access to him without going through Acker or anyone else to lodge grievances. Cf. id. (basing conclusion of aided-by-agency vicarious liability on unchallenged findings that harassing supervisors had "virtually unchecked authority" over "all aspects of [victim's] day-to-day activities," and that victim was "completely isolated from the [employer's] higher management").

If these facts did not suffice to foreclose the claim, the clincher lies in Mikels' demonstrated lack of any sense of special vulnerability or

16

defenselessness deriving from whatever authority Acker's corporal rank conferred. Immediately following Acker's unwelcome conduct, Mikels, by her own testimony, rebuffed him in an obscenity- and profanity-laced outburst (see J.A. 67) rejected his immediately proffered apology, and the next day filed a formal grievance against him. That is not likely the conduct of one "reluctant to accept the risks of blowing the whistle on a superior," but more naturally the conduct of one who thinks of her harasser as merely a fellow-employee from whose unwelcome conduct she is free to walk away or whom she can "tell where to go." See id. at 2291.

We therefore conclude that a remand to allow attempted proof of aided-by-agency-relation vicarious liability is not warranted.

B.

Mikels' challenge to the district court's dismissal of her parallel § 1983 claim requires little discussion. Her apparent theory--and it is not too plain--is that Brown's decision in reducing the sanctions imposed upon Acker violated her Fourteenth Amendment equal protection rights. Under settled doctrine, the City could only be liable for this action by Brown--assuming that its effect was to deprive her of equal protection rights by discriminating against her because of her sex--if it was effectively caused by a City "policy or custom," Monell v. Department of Social Servs. of New York, 436 U.S. 658, 694 (1978); Spell v. McDaniel, 824 F.2d 1380, 1385-86 (4th Cir. 1987), or if in taking the action Brown was acting by express or implied delegation of authority from the City, as its "policymaker" in matters of personnel management. See Spell, 824 F.2d at 1387.

The district court considered both of these possible theories, and properly rejected both as a matter of law. Mikels'"municipal policy or custom" contention was based on Brown's having at one point explained his decision as having been based on "double jeopardy" concerns which he first erroneously attributed to City personnel regulations, then to his own "sense." Mikels contended in the district court and repeats the contention here--as we understand it--that if there was such a City regulation, it embodied the requisite "policy" for holding it liable for Brown's decision implementing it; that if it was not, then allowing Brown to act upon his own "sense of double jeop-

17

ardy" is indicative of a customary practice which the City condoned by allowing it to go "unchecked." The lack of any merit in these contentions is patent and the district court properly so held.**6**

The alternative contention, that in making the administrative decision, Brown was acting under delegated authority as the City's final policymaker in matters of personnel management, is equally without merit. It suffices to say that even if Brown's decision were taken as "final" action concerning the discipline of Acker, it could only be considered an episodic exercise of discretion in an operational detail of municipal government, and not an exercise of delegated authority to establish and directly implement overall City policy respecting employee discipline. See id. at 1386 (differentiating policymaking and execution from discretionary actions, even if "final," that concern mere "operational details of government"). Brown's decision--even assuming that it could be found to have caused injury to any constitutionally-protected right of Mikels--clearly falls on the non-policymaking side of municipal officials' conduct, and the district court properly rejected this theory of municipal liability.

AFFIRMED

_____

**6** Mikels sought to support this theory of municipal liability resulting from Brown's decision with proffered evidence of an ulterior motive for it. The specific proffer was of circumstantial evidence designed to support an inference that the decision was induced by a favorable credit transaction arranged for Brown by a female credit-officer friend of Acker's. The district court noted the proffer and declined to consider it on the basis that, because entirely speculative, it could not properly be considered under Fed. R. Civ. P. 56. We think that ruling was proper on the more fundamental basis that the proffered showing, even if true, was irrelevant to the issue whether the decision could be attributed to the City as one of its policy or condoned custom. As the district court put it, the "propriety" of Brown's conduct, in the sense suggested by this disturbing proffer, was not within its "province."

18