**Jolena N. SUTTON, Plaintiff,**

v.

**ZEMEX CORPORATION, a Delaware Corporation, d/b/a Suzorite Mineral, Defendant.**

**No. 2:01CV205–C.**

United States District Court,
W.D. North Carolina,
Bryson City Division.

March 28, 2003.

Jolena N. Sutton, Murphy, NC, pro se.

George W. Moore, Asheville, NC, for plaintiff.

Richard L. Rainey, Patricia E. Dowds, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for defendant.

### MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the Court on the motion of Defendant Zemex Corpora-

tion for summary judgment, filed in this matter on September 6, 2002. Upon consideration of the pleadings, the motion, and supporting memorandum, the Court finds that Defendant's motion for summary judgment is due to be granted and judgment entered in favor of Defendant Zemex Corporation.

## I. Procedural History

Plaintiff filed this action on August 30, 2001, alleging that Defendant discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–1 *et seq.* Specifically, Plaintiff alleged that she was sexually harassed by a male co-worker and that Defendant failed to address her complaints, creating a hostile work environment in violation of Title VII. Defendant filed its Answer on October 15, 2001. On August 14, 2002, this Court entered an order permitting Plaintiff's counsel, George W. Moore, to withdraw; Plaintiff has proceeded *pro se* since that date.

On September 6, 2002, Defendant filed its motion for summary judgment and supporting memorandum. On September 26, 2002, this Court entered an order granting Plaintiff an additional forty-five days to respond to Defendant's motion for summary judgment or hire counsel. This Court entered a second order granting Plaintiff additional time in which to respond to Defendant's motion or hire counsel on November 20, 2002. When Plaintiff failed to respond to Defendant's motion by the date set in the second order extending her time, the Court set a status hearing in the matter for January 27, 2003. Plaintiff, however, failed to appear for the status hearing on January 27, and on January 31, 2003, the Court entered an Order to Show Cause, requiring Plaintiff to appear on February 19, 2003 to show cause as to why judgment should not be entered against her. Plaintiff filed a motion to continue the hearing on the order to show cause on February 18, 2003, and the next day this Court granted Plaintiff's motion to continue, resetting the hearing on the Order to Show Cause for March 10, 2003. On March 5, 2003, Plaintiff filed yet another motion to continue the hearing on the Order to Show Cause, which this Court denied. The hearing on the Order to Show Cause was conducted by the Court on March 10, 2003, and Plaintiff did not appear. The Court nevertheless heard argument from Defendant concerning its motion for summary judgment. Plaintiff still has failed to produce any evidence in response to the evidence filed by Defendant in support of its motion for summary judgment over six months ago, notwithstanding numerous opportunities to do so.

## II. Factual Background

Defendant, doing business as Suzorite Mineral Products, operates a barite processing plant in Murphy, North Carolina. The Murphy plant is a small facility, generally employing a plant manager, an office assistant, and two laborers. (Baker Aff. attached as Exh. C to Def. Mot. for Summ. J. ("Baker Aff.") at ¶ 6; George Aff. attached as Exh. D to Def. Mot. for Summ. J. ("George Aff.") at ¶ 6). The plant manager reported to an area manager, who was responsible for the oversight of plant operations within a particular geographic area. (Baker Aff. ¶ 3). The area manager and the Vice President of Human Resources shared responsibility for personnel decisions, such as hiring and termination decisions. (Baker Aff. ¶ 4; George Aff. ¶ 3; Dalrymple Aff. attached as Exh. E to Def. Mot. for Summ. J. ("Dalrymple Aff.") at ¶ 3).

Plaintiff, a white female, was hired as one of the laborers on August 9, 1996.

(Baker Aff. ¶ 9; George Aff. ¶ 4). At the time Plaintiff was hired, the Murphy plant operated eight months out of the year, and Plaintiff was considered only a part-time employee. (Baker Aff. ¶ 8; George Aff. ¶ 5). In May of 1998, however, the plant shifted to a year-round operating schedule, and plant laborers became full-time employees eligible for benefits. (Baker Aff. ¶ 8; George Aff. ¶ 5). After becoming a full-time employee, Defendant provided Plaintiff with a copy of Defendant's Employee Handbook and a hand-out entitled, "Standards of Conduct." (Baker Aff. ¶ 11; George Aff. ¶ 20). Plaintiff signed an acknowledgment that she had received the Employee Handbook in May 1998 and an acknowledgment that she had received the "Standards of Conduct" on May 12, 2000. (Exh. B attached to Scott Aff.). Section 9:920 of the Employee Handbook provided that certain conduct, including excessive absenteeism or tardiness, physical or verbal harassment, and fighting may result in disciplinary action, up to and including discharge. (Employee Handbook attached as Exh. A to Baker Aff.). The Standards of Conduct hand-out provided that leaving company premises or assigned work area during working hours without approval of management would result in disciplinary action ranging from verbal or written warnings to suspension or to immediate suspension with intent to discharge, depending on the act and the circumstances. (Standards of Conduct Hand-out attached as Exh. A to Baker Aff.).

In addition to the handbook and Standards of Conduct hand-out, Defendant also posted a copy of its sexual harassment policy at the Murphy plant. (Exh. C attached to George Aff. ("Sexual Harassment Policy")). According to this policy, any employee who believed that she was a victim of sexual harassment should report the act immediately to her supervisor, or, if she preferred not to discuss the matter with her supervisor, any other member of management. (Id. ¶ 1). Also according to the policy, any employee, supervisor, or agent found to have sexually harassed another employee would be subject to disciplinary action, up to and including discharge. (Id. ¶ 2).

From the beginning of her employment in August of 1996 until March of 1999, Fred Dalrymple was Plant Manager at the Murphy plant and Plaintiff's direct supervisor. (Baker Aff. ¶¶ 2, 7). On or about March 12, 1998, Scott Baker, the Area Manager, visited the Murphy plant to talk with Plaintiff because of numerous absences and instances in which she left work early or arrived late. (Baker Aff. ¶ 15). During the course of Mr. Baker's conversation with Plaintiff, Plaintiff reported that Fred Dalrymple had made a comment which she found offensive. (Id.) Specifically, Plaintiff reported that Fred Dalrymple, likely in recognition of the fact that Plaintiff was dating an African–American man at the time, said, "If I were a little bit younger, I would take you out back and show you what a white man can do for you." (Id.) Mr. Baker stated in his affidavit that Plaintiff had never complained before of inappropriate conduct at the plant or reported any behavior of a sexual nature. (Id. ¶ 16).

In response to Plaintiff's complaint, Mr. Baker conducted an investigation, interviewing Plaintiff and Fred Dalrymple. (Baker Aff. ¶ 17). According to Mr. Baker, Plaintiff did not report any other offensive comments, nor did she complain about any physical contact or gestures she found offensive. (Id. at 18). Mr. Baker notified the Vice President of Human Resources, Scott George, who then met with Plaintiff, Fred Dalrymple, and Jerry Dalrymple, Fred Dalrymple's nephew and also an employee at the plant. (George Aff. ¶¶ 10, 11; Mem. to Fred Dalrymple attached as

Exh. A to George Aff.). Following his investigation, Mr. George sent Fred Dalrymple, on March 30, 1998, a memorandum discussing his investigation and stating that while Fred Dalrymple may not have intended to make a sexual advance, "[d]erogatory racial comments and off-color sexual remarks may be considered harassment and [could not] be tolerated in the workplace." (Mem. to Fred Dalrymple attached as Exh. A to George Aff.). The memorandum stated further that "a repeat of any comment or actions which may be considered sexually or racially harassing will be dealt with very severely." (*Id.*) Finally, in the memorandum, Mr. George informed Fred Dalrymple that Plaintiff had "properly exercised her right to express concern regarding sexual harassment under Company policy and should not be subject to retaliation." (*Id.*)

Also on March 30, 1998, Mr. George sent Plaintiff a memorandum summarizing the results of his investigation and describing to her the content of the memorandum he had sent to Fred Dalrymple instructing him to refrain from any similar conduct in the future. (Mem. to Jolena Sutton attached as Exh. B to George Aff.). In his memorandum to Plaintiff, Mr. George stressed that "a repeat of any such comments or actions should be reported immediately and will again be treated seriously." (*Id.*) Further, Mr. George stated that Plaintiff had properly exercised her right to express concern regarding sexual harassment under Company policy and should not be subject to retaliation. (*Id.*)

Plaintiff testified in her deposition, however, that in addition to making the comment acknowledged by Mr. Baker, Fred Dalrymple also pinched her on the butt approximately four times and tried "to pull [her] shirt out and look down [her] blouse" on two occasions. (Sutton Dep. attached as Exh. F to Def. Mot. for Summ. J.

("Sutton Dep.") at 17). Plaintiff testified that these incidents occurred before she spoke with Mr. Baker in March of 1998 and that she did inform Mr. Baker about them. (*Id.* at 17–18). Plaintiff acknowledged, however, that after she spoke with Mr. Baker, she understood that if she felt she was being sexually harassed, she could report it immediately to Mr. George and that there were no more incidents of sexual behavior directed toward her by Fred Dalrymple following her meetings with Mr. Baker and Mr. George. (*Id.* at 21, 41).

In March of 1999, Jerry Dalrymple became Plant Manager at the Murphy plant. In late February or early March of 2000, Defendant hired Chris Carson as a plant laborer, working with Plaintiff. (Sutton Dep. at 24). According to Jerry Dalrymple, Plaintiff generally got along with the laborer with whom she worked, including Mr. Carson, but she got into regular "tiffs" or disagreements with the laborers with whom she worked, based on her assertion of seniority or disappointment with that person's decision to do a task in a way other than instructed by Plaintiff. (Dalrymple Aff. ¶¶ 6, 7). With respect to Mr. Carson, in particular, Jerry Dalrymple stated that he witnessed many "tiffs" between Plaintiff and Mr. Carson and that they were "akin to spats between siblings." (*Id.* ¶ 8). Jerry Dalrymple stated in his affidavit that he would occasionally tell Plaintiff and Mr. Carson to "knock it off" but that they would be back at it in a matter of days. (*Id.* ¶ 9). According to Jerry Dalrymple, none of these disagreements involved conduct that was sexual in nature, comments about sex, or remarks or actions directed at Plaintiff because of her gender, nor did Plaintiff ever mention any conduct or statements that she believed to be sexual in nature or directed toward her because of her sex. (*Id.* ¶¶ 10, 13). Jerry Dalrymple acknowledged that Plaintiff told

him that Mr. Carson bothered her and that she did not like working with him, but the only specific complaints she made concerned Mr. Carson's calling her "honky" or "white trash" during their arguments. (*Id.* ¶ 12). Jerry Dalrymple stated that when Plaintiff complained about these comments, he talked with Mr. Carson and instructed him not to call Plaintiff names. (*Id.*)

In her deposition, however, Plaintiff testified that while she joked frequently with Jerry Dalrymple and Mr. Carson and ate lunch with Mr. Carson, (Sutton Dep. at 33), Mr. Carson regularly engaged in behavior that made Plaintiff feel uncomfortable, (*id.* at 23). Specifically, Plaintiff testified that Mr. Carson patted her on the butt three or four times, called her white trash and honky, and proposed that if he won the lottery, he would give her $100,000 if she would have sex with him. (*Id.* at 24, 25). According to Plaintiff, Jerry Dalrymple witnessed the proposition, and they talked about it; but Plaintiff "just ... let it go by, ignored it." (*Id.* at 25). No one, according to Plaintiff, witnessed Mr. Carson's conduct in patting her on the butt. (*Id.* at 26). Plaintiff also testified that Mr. Carson called her a "bitch," said she was stupid, and commented that he was not going to work under Plaintiff, since she was a woman. (*Id.* at 26–27). Plaintiff testified that Jerry Dalrymple heard Mr. Carson call her a "bitch" the first time it happened and spoke with Mr. Carson about his behavior. (*Id.* at 28–29). Plaintiff testified that Jerry Dalrymple instructed Mr. Carson not to talk to Plaintiff that way and told them to get along, to which Plaintiff responded, "Well, I don't have a problem with him." (*Id.* at 29). With respect to Mr. Carson's comment that he did not want to work under a woman, Plaintiff testified that Jerry Dalrymple spoke with Mr. Carson and the two "had an argument from there."

(*Id.* at 27). Plaintiff testified that, on one occasion, Mr. Carson picked her up and tossed her on top of a pallet with a number of bags on top of it. (*Id.* at 23). According to Plaintiff, Mr. Carson's wife was also present, and the incident made her feel uncomfortable. (*Id.*) Although Plaintiff acknowledged in her deposition that if she felt she was being sexually harassed, she could report it to Mr. George, (*id.* at 21), she testified that she never spoke with Mr. George, Mr. Baker, or Mr. Baker's replacement about Mr. Carson's behavior, (*id.* at 35, 42). She also testified, however, that she was "told plainly by [her] supervisor not to go over his head." (*Id.* at 31).

On September 7, 2000, the incident which led to Plaintiff's termination occurred. According to Jerry Dalrymple, who was at the plant that morning, he had asked Mr. Carson to grease a particular machine and left the plant floor for a short while. (Dalrymple Aff. ¶ 15). When he returned, he heard Mr. Carson say to Plaintiff, "You're so damn stupid." (*Id.*) Jerry Dalrymple stated in his affidavit that Plaintiff then told Mr. Carson that if he called her "stupid" again, she would "bust his damn head." (*Id.*) When Mr. Carson again muttered "you're stupid" under his breath, Plaintiff threw a five-pound piece of metal at him and started swinging at him, landing a few punches before Jerry Dalrymple could get her off of Mr. Carson. (*Id.*) According to Jerry Dalrymple, she hit him as he was pulling her off of Mr. Carson and then threw a grease gun at Mr. Carson before "storm[ing] out of the plant." (*Id.*) Jarry Dalrymple stated that he told her several times not to leave the plant, but she replied that if she stayed she would "kill him" and left the premises. (*Id.*) In his affidavit, Jerry Dalrymple stated that he investigated the incident and learned that Mr. Carson had wanted to use the grease gun Plaintiff was using and

called her "stupid" when she would not hand it over, beginning the altercation. (*Id.*) Jerry Dalrymple stated further that after the incident he contacted Mr. Baker, who instructed him to call Mr. George. (*Id.* ¶ 18).

The next morning, September 8, Mr. George interviewed Jerry Dalrymple, Mr. Carson, and Plaintiff. (Dalrymple Aff. ¶¶ 20, 21; George Aff. ¶¶ 16, 17). After asking Plaintiff about the incident and hearing from Jerry Dalrymple and Mr. Carson, Mr. George told Plaintiff that her leaving the plant violated Company rules against insubordination and leaving the plant during work hours without permission and that her employment was terminated. (Dalrymple Aff. ¶ 22). Mr. Carson received a three-day suspension of work without pay. (George Aff. ¶ 21). Both Mr. George and Jerry Dalrymple stated in their affidavits that Plaintiff never, during their investigation of the September 7 incident, stated that the incident involved sexual harassment or was in any way related to her gender, nor did Plaintiff report conduct that she believed to be sexual harassment or directed toward her because of her sex. (Dalrymple Aff. ¶ 23; George Aff. ¶ 18).

In her deposition, Plaintiff explained that the dispute began when she refused to give Mr. Carson the grease gun she was then using, because there was another grease gun available that was only less desirable because Mr. Carson had failed to fill it with grease. (Sutton Dep. at 57). Plaintiff testified that she told him to go fill up the other grease gun, and he replied that "he wasn't putting his hands in no grease ... and kept calling [Plaintiff] stupid." (*Id.* at 57). Plaintiff denied that she threw the piece of metal or the grease gun at Mr. Carson, but rather, testified that she threw the piece of metal to the floor and the grease gun up like a shot put. (*Id.*

at 55). Plaintiff also testified that she struck Mr. Carson after he pushed her and later accidentally struck Jerry Dalrymple for which she apologized. (*Id.* at 56). Plaintiff acknowledged in her deposition that Jerry Dalrymple repeatedly told her not to leave, to which she responded, " 'You haven't done nothing about this. This is enough of it.' " (*Id.* at 61). Plaintiff also acknowledged that during her final meeting with Mr. George she never complained that she had been sexually harassed or that she thought her employment was being terminated because of her sex. (*Id.* at 66).

On September 13, 2000, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been subjected to a hostile work environment based on her sex. Specifically, Plaintiff alleged that she had been called names by her male co-worker and that Jerry Dalrymple had been aware of the harassment and done nothing to stop it. (Exh. 6 attached to Sutton Dep.). Plaintiff also alleged in her EEOC charge that she had been discriminated against on the basis of her disability, a back injury. (*Id.*)

## III. Summary Judgment Standard

The standard for summary judgment is familiar. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In evaluating a motion for

summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *Id.,* 477 U.S. at 255, 106 S.Ct. at 2514. However, once the movant has shown an absence of any genuine issue of material fact, the nonmoving party must produce evidence demonstrating that a triable issue of fact exists. *See id.,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

## IV. Discussion

■ Title VII prohibits employers from, *inter alia,* discriminating against an employee based on sex with respect to the terms, conditions, or privileges of employment. *See* 42 U.S.C. § 2000e–2(a)(1). It is now well settled that an employee's work environment is a term or condition of employment, such that the creation of a hostile work environment on the basis of an employee's sex creates a cause of action under Title VII for hostile work environment sexual harassment. *See Anderson v. G.D.C., Inc.,* 281 F.3d 452, 458 (4th Cir. 2002); *Equal Employment Opportunity Comm'n v. R & R Ventures,* 244 F.3d 334, 338 (4th Cir.2001). In order to establish a cause of action for a hostile work environment based on sex, an employee must show: (1) the harassment was because of sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer. *See R & R Ventures,* 244 F.3d at 338; *Conner v. Schrader–Bridgeport Internat'l, Inc.,* 227 F.3d 179, 192 (4th Cir.2000). In this case, while the question of whether a genuine issue of material fact exists with respect to the first three requirements is, at the least, close, it is clear from the evidence presented that there is no genuine issue as to whether a basis exists for imputing liability to the employer. For that reason,

the Court will move directly to a discussion of this issue.

■ In order to hold an employer liable for a hostile work environment created by a supervisor, a co-worker, or both, there must be some basis for imputing liability to the employer. The standard differs, however, depending on whether the alleged harasser is a supervisor or a co-worker of the plaintiff's. *See Mikels v. City of Durham,* 183 F.3d 323, 331–32 (4th Cir.1999). If the alleged harasser is a co-worker, in order to impute liability to the employer, the plaintiff must produce sufficient evidence to show that the employer had actual or constructive knowledge of the harassing behavior and failed to take prompt and adequate action to stop it. *See Mikels,* 183 F.3d at 332. Where, however, the alleged harasser is a supervisor, the employer may be held liable for the creation of the hostile work environment, unless it can establish the affirmative defense that: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the victim had unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *Mikels,* 183 F.3d at 332. Viewing the evidence in the light most favorable to Plaintiff, she was subject to sexually harassing behavior by Fred Dalrymple some time between the date she was hired in August of 1996 and March of 1998 and by Mr. Carson between March and September of 2000. Because Fred Dalrymple was Plaintiff's supervisor and Mr. Carson was her co-worker, we address her allegations against each separately.

## A. Fred Dalrymple

█ Plaintiff first alleges that she was subject to sexually harassing behavior by her immediate supervisor, Fred Dalrymple, some time between the date she was hired in August of 1996 and March of 1998, when she reported his behavior to Fred Dalrymple's supervisor, Scott Baker. As an initial matter, it is apparent from the record that to the extent that Plaintiff relies on the alleged sexually harassing behavior of Fred Dalrymple, her claim is time-barred. Title VII requires that claimants file a complaint with the EEOC within 180 days of the allegedly harassing incident. *See* 42 U.S.C. § 2000e–5(e). In this case, the last act alleged by Plaintiff to be sexually harassing occurred in March of 1998, approximately two-and-a-half years before she filed her EEOC complaint on September 13, 2000. While incidents that occurred earlier than the 180–day time period may be considered by the court where they are sufficiently related to a timely incident, such that the incidents can be considered to constitute a single, continuing violation, *see Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir.1997); *Roberts v. Gadsden Mem. Hosp.*, 835 F.2d 793, 799–800 (11th Cir.), *modified*, 850 F.2d 1549 (11th Cir.1988), there appears to be no relationship between the untimely incidents involving Fred Dalrymple and the timely incidents involving Mr. Carson. Fred Dalrymple was replaced as supervisor by his nephew about whom Plaintiff does not complain, and approximately a year lapsed between the time Fred Dalrymple left his employment with Defendant and the date Defendant hired Mr. Carson. While both men allegedly sexually harassed Plaintiff, there is no other relationship between the incidents from which the Court can conclude that they constitute a single, continuing violation, barring Plaintiff's allegations as to Fred Dalrymple's behavior as untimely.

█ Even if the incidents did constitute a continuing violation, rendering Plaintiff's allegations against Fred Dalrymple timely under Title VII, the evidence produced by Defendant in support of summary judgment makes clear that it can successfully prove the affirmative defense contemplated by *Ellerth* and *Faragher*. Specifically, the undisputed evidence makes clear that the first time Plaintiff complained about Fred Dalrymple's behavior toward her was during her meeting with Mr. Baker in March of 1998. The evidence is undisputed that Mr. George, after conducting an appropriate investigation, wrote Fred Dalrymple a letter warning him not to engage in any further conduct that could be considered sexually harassing and not to retaliate against Plaintiff for reporting his conduct. Plaintiff admits that she was told that she had properly exercised her right to be free from sexually abusive behavior and that Fred Dalrymple never again engaged in sexually harassing behavior toward her. The evidence is undisputed, then, that Defendant, as Plaintiff's employer, exercised reasonable care to prevent and correct promptly any sexually harassing behavior directed toward Plaintiff, establishing the first prong of the affirmative defense. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2292–93. As to the second requirement—that the victim had unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise—it is also undisputed that Plaintiff knew that she was entitled to report any sexually harassing conduct to Mr. Baker or Mr. George and that she failed to do so until March of 1998, after which the problem with Fred Dalrymple was resolved. Accordingly, even if Plaintiff could assert a timely claim of hostile work environment sexual harassment based on Fred

Dalrymple's conduct toward her, the undisputed evidence establishes that Defendant may not be held liable for that conduct under *Ellerth* and *Faragher*.

## B. Chris Carson

■ Because Mr. Carson was Plaintiff's co-worker and not her supervisor, in order for the Court to impute liability for his conduct to Defendant, Plaintiff must produce sufficient evidence to show that Defendant had actual or constructive knowledge of the harassing behavior and failed to take prompt and adequate action to stop it. *See Mikels,* 183 F.3d at 332. According to Plaintiff's deposition testimony, however, the only incidents Jerry Dalrymple witnessed were the single proposition made by Mr. Carson that if he won the lottery, he would give Plaintiff $100,000 to have sex with him; the first time Mr. Carson called Plaintiff a "bitch"; and the comment by Mr. Carson that he did not want to work under Plaintiff because she was a woman. After each of these incidents, Jerry Dalrymple spoke with Mr. Carson about his comments. Plaintiff testified that she decided to ignore the single proposition and that Jerry Dalrymple spoke with Mr. Carson about his calling Plaintiff a "bitch" and stating that he did not want to work under her since she was a woman. While Plaintiff testified that Mr. Carson continued to call her names and engage in conduct she found "uncomfortable," she did not report any other incidents to Jerry Dalrymple, Mr. Scott, or Mr. George.

Further, the evidence is undisputed that Plaintiff never identified any of Mr. Carson's behavior as sexually harassing or directed toward her on the basis of her sex, notwithstanding the fact that she had previously been informed of Defendant's Sexual Harassment Policy and had successfully, without apparent retaliation, employed that policy to end Fred Dalrymple's sexually harassing behavior. Indeed, the evidence is undisputed that the time of the Fred Dalrymple incident, she had been encouraged to report immediately any conduct she found sexually or racially offensive in the future. In the case of Mr. Carson, Jerry Dalrymple happened to witness a few of the comments Plaintiff now identifies as sexually harassing, but she never identified them as sexually offensive at the time or otherwise took advantage of the mechanism Defendant had in place for handling such offensive behavior.

In sum, Defendant cannot be considered to have had actual or constructive knowledge about any offensive conduct, other than three apparently isolated comments made by Mr. Carson. On each occasion, Jerry Dalrymple spoke with Mr. Carson, and in the context of a working relationship described by both Plaintiff and Jerry Dalrymple as one in which there was a great deal of joking, as well as outbursts of volatile conflict, no reasonable jury could conclude that Defendant was aware of conduct rising to the level of actionable sexual harassment and failed to take adequate or prompt remedial measures.

## V. Conclusion

Plaintiff's allegations involving sexually harassing behavior by Fred Dalrymple are barred as untimely under 42 U.S.C. § 2000e–5(e). Even if these allegations were timely, however, and even if Plaintiff could produce sufficient evidence to establish the first three requirements of a Title VII claim for a hostile work environment on the basis of her sex, Plaintiff cannot establish, based on the evidence before the Court, a basis for imputing liability for either Fred Dalrymple's or Mr. Carson's behavior to Defendant. Defendant is entitled to summary judgment, and judgment

for Defendant will be entered contemporaneously herewith.