UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DIANE ALEXANDER,
            *Plaintiff-Appellant,*

v.

ALCATEL NA CABLE SYSTEMS,
INCORPORATED,
            *Defendant-Appellee.*

No. 01-2077

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-97-637-R)

Argued: June 5, 2002

Decided: October 15, 2002

Before MICHAEL, Circuit Judge, Robert R. BEEZER,
Senior Circuit Judge of the United States Court of Appeals
for the Ninth Circuit, sitting by designation, and
Benson Everett LEGG, United States District Judge
for the District of Maryland, sitting by designation.

---

Reversed and remanded by unpublished opinion. Judge Legg wrote
the opinion, in which Judge Michael and Senior Judge Beezer joined.

---

## COUNSEL

**ARGUED:** Terry N. Grimes, KING, FULGHAM, SNEAD, NIXON
& GRIMES, P.C., Roanoke, Virginia, for Appellant. Bruce McCoy

Steen, MCGUIREWOODS, L.L.P., Charlotte, North Carolina, for Appellee. **ON BRIEF:** John S. Barr, Rodney A. Satterwhite, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

LEGG, District Judge:

This case requires us to decide whether the district court properly granted summary judgment to the defendant employer in a Title VII sexual harassment case. The lower court held that there was no basis on which to impute liability to the employer because its response to the alleged sexual harassment of the plaintiff was both prompt and effective. The district court deemed irrelevant evidence that the employer had failed to investigate and check harassment of other women that had occurred before the events that aggrieved the plaintiff. This was error. An employer, whose tepid reaction to complaints of abusive behavior emboldens would-be offenders, may be liable for failing to prevent subsequent harassment. Accordingly, we reverse the judgment of the district court and remand with instructions to consider this alternate basis of liability.

I.

Diane Alexander ("Alexander") appeals from the district court's order granting summary judgment to Alcatel NA Cable Systems, Inc. ("Alcatel") on her claim of sexual harassment under Title VII of the Civil Rights Act of 1964. Because we are reviewing a grant of summary judgment, we must view the facts in the light most favorable to the non-moving party, Alexander. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.

Alcatel's plant in Roanoke, Virginia, manufactured fiberoptic cable. Alexander worked at the plant from 1989 until the plant closed in December 1997. She made glass tubing in the sleeving department and worked every Friday, Saturday, and Sunday from 6:00 a.m. to 6:00 p.m. J.A. 67-69. Alexander claims that she was sexually harassed at various times during her tenure with Alcatel.

### 1. *Harassing Telephone Calls from December 1989 to January 1990*

Alexander alleges that in December 1989, Dale Anderson, a co-worker,[1] began calling her repeatedly to ask her out on dates. J.A. 49. Alexander contends that Anderson obtained her home telephone number from John Gray, one of the plant managers. The calls were so persistent that Alexander changed her telephone number four times within six months. After the first three number changes, Alexander refused to give her new phone numbers to Gray for fear that he would pass them along to Anderson. In January 1990, Anderson stopped calling after Alexander began dating another co-worker. J.A. 49-50.

### 2. *Harassment of Other Women from 1990-1996*

Alexander suffered from no harassing conduct between 1990 and 1996. She has, however, supplied the affidavits of two other employees, Beth Ann Witt Wheeler and Joan Saunders, who complained of persistent sexual harassment during this time. J.A. 322-26.

In her affidavit, Wheeler states that she was repeatedly abused, both verbally and physically, by Anderson. This abuse began when Anderson propositioned her in the company parking lot. Wheeler describes the incident as follows:

> Anderson grabbed me and pulled me toward him. He apparently had been drinking. He said, "Come on! Let's go to the

---

[1]Alexander and Anderson worked in different departments and Anderson was not her supervisor.

> parking lot. You'll like it. J.R. (my husband) doesn't need to find out. Let's have some fun." I pushed Anderson away. This sort of thing happened many times over the course of my shift that night. When I told my supervisor, Rick Silva, about the harassment, Mr. Silva said to just avoid Anderson. He also told me, "don't let him get you cornered," or words to that effect.

J.A. 322.

Wheeler further relates that Anderson, upon learning that she had complained to Silva, accosted her with threats, including: "you fucking bitch;" "get out of my face;" "I ought to kill you;" "I'll beat the hell out of you;" and "I'll kill J.R. [her husband]." *Id.*

Wheeler claims that when she reported Anderson's threats to her supervisor, he took no action other than to advise her to avoid Anderson. *Id.* A few days later, Wheeler asserts that Anderson sexually assaulted her again by groping at her body and threatening, "I'm gonna find out what's in them damn pants." Wheeler's affidavit states that the supervisor witnessed this encounter, but stood by idly. *Id.*

Wheeler also claims that she received at least eighteen vulgar telephone calls at work over a five month period beginning in September 1995, and ending on February 22, 1996. The record is unclear whether Wheeler notified her supervisors about these phone calls.

Joan Saunders's affidavit asserts that she was sexually harassed by two of her co-workers, Anderson and Jeffrey White. Concerning Anderson, Saunders alleges that he frequently subjected her to sexually suggestive gestures and vulgar comments regarding her anatomy and sex life. Saunders's affidavit does not mention whether she notified her supervisor about Anderson's misconduct.

Saunders claims that in 1996, Jeffrey White began his harassment by brushing up against her, and then claiming that Saunders had "brushed up against him with [her] big buffalo ass." J.A. 325. Saunders responded to White that if he had a grievance with her, he should discuss it with a supervisor. White rejoined, "I don't want to

take it to the supervisor. I'll just have my friends come over here and fuck you up." *Id.* Saunders reported the incident to Alcatel management. She also swore out an arrest warrant against White. Saunders complains that the company failed even to investigate her charge.

Saunders alleges that White sexually assaulted her on two later occasions. She reported both assaults to management. The plant manager promised to move her to another shift, but the record is unclear as to whether this occurred.

Saunders also reports that Alcatel tolerated sexually demeaning graffiti. For example, the phrase "Joe sucks Joan's pussy" and other offensive messages were written at or near her work station. J.A. 326. Saunders claims that she began complaining to her supervisors in January 1996. The record is silent regarding what measures, if any, the company took to end this harassment.

Similar to Wheeler, Saunders also received vulgar internal telephone calls while at the plant. The record does not reveal when these phone calls took place, whether Saunders reported them to management, and what measures, if any, were taken to stop them.

### 3.  *Anderson's Alleged 1996 Assault of Alexander and its Aftermath*

Despite the initial spate of aggressive telephone calls, Anderson and Alexander worked amicably together from 1990 until September 1996. Although Alexander claims that Anderson made isolated sexual remarks during this interval, such as, "I'd like to get next to that," she concedes that she considered Anderson to be a friend. J.A. 47.

This harmony unexpectedly ended on Saturday, August 24, 1996. Alexander contends that she asked Anderson to unlock a maintenance room so that she could retrieve supplies. After unlocking the door, Anderson followed her into the room and locked the door behind him. Anderson then began complaining about his girlfriend, Wyonna Altizer, a fellow Alcatel employee. Anderson criticized Alitzer as a "slut," yet reported that he was not "getting it at home." J.A. 320.

Anderson then grabbed Alexander's breasts, shoved her over a counter, pushed himself up against her, tried to unzip her pants, and eventually knocked her to the floor. Anderson boasted that Alexander would "enjoy it" if she just gave him a "chance." Alexander fought back, kicking at Anderson. According to Alexander, Anderson then poured a line of cocaine onto the table and said "Diane, just chill out. Come over and do this." Alexander refused, blew the cocaine off the table, ran out of the maintenance room, and sought refuge in the women's bathroom, where she began to cry.[2]

After leaving the bathroom, Alexander tried to locate her supervisor, Jack Daniels, but could not find him. She paged Daniels without success. J.A. 64-65. When Alexander returned to her station, she told two of her co-workers about the assault. After finishing her shift, Alexander went to the local magistrate's office to report the incident. An employee at the magistrate's office suggested that Alexander speak with her supervisor before filing charges.

The next day, August 25th, Alexander reported the assault to supervisor Daniels. Daniels advised her to "stay away from [Anderson] and not to be alone with him." J.A. 77. Alexander told Daniels that she wished to press charges. In response, Daniels promised that he would discuss the matter with Brian Colton, the production manager at Alcatel.

Alexander also reported the assault to Walter Grossheim, the chief union steward, who advised Alexander not to be alone with Anderson or his girlfriend, Wyonna Altizer. J.A. 78. Alexander did not work the following weekend, but instead accompanied her boyfriend to Illinois. Alexander initially requested vacation time off for the trip. When a supervisor denied the request as untimely, Alexander asked the supervisor to back-date her request. Faced with the supervisor's refusal, Alexander simply failed to report. Alexander later made a half-hearted attempt to justify the unexcused absence under the Family and Medical Leave Act ("FMLA"). The supervisor reported Alexander's misconduct to Alcatel official Brian Colton.

---

[2]Anderson denies that he assaulted Alexander on this or any other occasion.

Alexander returned to work on Friday, September 6th, and left Brian Colton a phone message inquiring about the company's investigation of her claim against Anderson. Colton returned Alexander's call and scheduled a meeting for September 13th to discuss Alexander's assault allegations and her possible abuse of the FMLA policy. Colton contends that Alexander's phone message was the first notice he received of the alleged sexual assault. J.A. 285.

Alexander contends that Wyonna Altizer, Anderson's girlfriend, physically attacked her that same weekend. Alexander testified on deposition that Altizer "came over the desk . . . and put her hands across my neck and swore all this stuff at me and said that she would kill me. She cussed me out, told me that if I ever laid hands on [Anderson] — you know . . . that I have always wanted [Anderson]. . . ." J. A. 101. Alexander states that she reported the assault to supervisor Daniels. A few days later, Altizer allegedly attacked Alexander a second time.[3]

On September 13th, Alexander met with Brian Colton, Walter Grossheim, and other company representatives to discuss the allegations of: (i) sexual assault by Anderson, (ii) attacks by Altizer, and (iii) abuse of the FMLA policy by Alexander. Colton opened the meeting by explaining, "We are here to investigate some serious allegations of attempted rape/sexual assault." J.A. 299. Colton then invited Alexander to describe the assaults by Anderson and Altizer. Colton promised that Alcatel would investigate her charges.

Colton then focused the meeting on Alexander's missed weekend. After some discussion, Colton concluded that Alexander had abused Alcatel's FMLA policy, asked her supervisor to lie for her, and falsified time records. Colton "wrote up" Alexander for these infractions and placed her on indefinite suspension.[4] J.A. 286, 305.

---

[3]Apparently, Altizer's alleged attack was motivated by jealousy rather than a desire to punish Alexander for reporting Anderson to management.

[4]Ultimately, Alexander was suspended for only three days before returning to work.

Following the meeting, Colton investigated the assault. He interviewed Anderson, who denied assaulting Alexander or even following her into the stockroom. J.A. 286. Colton also interviewed Grossheim, who claimed to have been present when Alexander asked Anderson to unlock the supply room. Grossheim reported that he saw Anderson unlock the door, but that Anderson did not follow Alexander into the storeroom. *Id.* Colton also interviewed Altizer, although the record is incomplete regarding what was discussed.

Although Colton was unable to substantiate Alexander's allegations, he contacted the police department to report her accusations and to offer his interview notes. J.A. 98, 181, 286. The police interviewed Alexander, who swore out an arrest warrant for Anderson. J.A. 99, 114. Although Anderson was brought to trial, the charges against him were eventually dismissed for lack of evidence.

In addition to contacting the police, Colton took other measures. He tried to separate Alexander and Anderson.[5] Colton warned Anderson that Alcatel prohibited sexual harassment and that he would be terminated if Alexander's allegations were ever substantiated. Alcatel also conducted a sexual harassment training program.

Alexander's only contact with Anderson after the alleged assault occurred approximately one year later, in August 1997. Alexander contends that Anderson approached her in the hall and said, "[N]ext time, [you] will get it." J.A. 234. Alexander claims that she updated her 1996 complaint paperwork to reflect this most recent confrontation. Colton disputes that Alexander advised him of the incident, however. J.A. 289.

4.   *Offensive telephone calls from*
*September 1996 to January 1997*

Alexander also contends that she began receiving offensive telephone calls over Alcatel's paging system beginning in September 1996. Alexander states that an anonymous caller often would return

---

[5]Alexander was required to ask a supervisor to retrieve any materials she needed from Anderson's work area. Alexander was permitted to leave her work area if Anderson had business there.

her pages, making lewd comments. After the first few calls, Alexander began documenting them in letters to her supervisors. J.A. 333-340. According to Alexander's notes, she received a total of four offensive calls on October 6th and 19th. The calls subsided until December 13th, when they began anew. Between December 13th and January 11th, she received sixteen additional calls.

Alcatel took three separate measures to end the calls. In October 1996, Colton told Alexander that she was no longer obligated to answer pages. J.A. 129-30, 288. On January 10 and 16, 1997, Colton issued memoranda reminding employees that the in-house phones and public address system were not to be used for prank calls or inappropriate announcements. J.A. 288, 312, 313. On January 15th, another supervisor issued a similar memorandum. J.A. 314. As a final measure, Colton equipped Alexander's telephone with "caller I.D." J.A. 288. The offensive telephone calls ceased after the caller I.D. was installed. J.A. 133-34.

### 5. *Sexually explicit postings*

Alexander also complains that throughout her tenure at Alcatel she was exposed to sexually explicit materials posted on bulletin boards and in cabinets. *See e.g.*, J.A. 253-61, 328-32. Although none of the postings specifically referenced Alexander, she found them offensive. Alexander never filed a formal complaint with Colton regarding the postings, but she would occasionally take them down and deliver them to him. Alexander recalls saying to Colton: "[Y]ou need to get these pictures off the walls. They are ridiculous." J.A. 126-27. She also complained about the postings to another supervisor.

Management did not ignore the offensive postings and always removed those that Alexander brought to its attention. Additionally, when it was possible to determine who had posted an inappropriate message, Alcatel disciplined the employee.

### 6. *Alcatel's Sexual Harassment Policy*

Alexander contends that she would have been spared from the assault and other harassment had Alcatel instituted and enforced an

effective sexual harassment policy prior to 1996. While Alcatel contends that it had a sexual harassment policy, the documentation is thin. The record contains three one-page documents, only two of which predate the alleged August 1996 assault.

The first document is a June 17, 1994 memorandum addressed to nineteen individuals.[6] It does not set out the company's policies and procedures for combating sexual harassment. Instead, it is a schedule for mandatory sexual harassment classes. J.A. 292. The memo states that the recipients should "[e]nsure that everyone in your group attends one of the classes." *Id.* The record does not include, however, any handouts or other documents that may have been distributed in connection with the classes.

The second is a January 18, 1996 memorandum reminding all plant employees of Alcatel's policy against sexual harassment. The memorandum states:

> It has come to our attention that some employees may be engaging in behavior which violates Alcatel's harassment policy. . . . All employees should understand that the Company will take all necessary and appropriate steps to identify, discipline, and cooperate with local law enforcement authorities in regard to any employees or other individuals who may have engaged in improper harassment.

J.A. 293.

The third is a November 1996 document stating that Alcatel "is committed to providing a work environment . . . free from sexual harassment. . . . Such action constitutes grounds for corrective discipline up to and including termination." J.A. 291. In contrast to the previous memoranda, this document advises employees whom to contact with reports of sexual harassment.[7]

---

[6]It is unclear what position each of the nineteen people held, but it appears that they were supervisors for various "groups" within the Roanoke facility.

[7]Many companies have a clearly stated sexual harassment policy in an employee handout or other widely distributed document. These policies

Alexander claims that she had neither seen nor heard of any of these documents until the instant litigation. Further, she argues that, even if such a policy was in place, it was neither well publicized nor enforced.

### B.

On September 22, 1997, Alexander filed the instant suit against Alcatel alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* On July 17, 2001, Alcatel moved for summary judgment pursuant to Fed. R. Civ. P. 56.

The district court heard oral argument and by Order of August 8, 2001, granted summary judgment in favor of Alcatel on both claims. On the retaliation claim, the district court found that Alexander had offered no evidence to show that Alcatel's asserted reason for suspending her (abuse of the FMLA policy) was a pretext. Alexander did not appeal from this ruling.

On the sexual harassment claim, the district court concluded that there was no basis for imputing liability to Alcatel. It is this ruling that is on appeal.

### II.

The Court reviews the district court's grant of summary judgment *de novo*, using the same standards applied by the district court. *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 771 (4th Cir. 1997).

### A.

Title VII creates a cause of action for "hostile work environment" sexual harassment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57,

---

usually outline a specific process that the employee is to follow when reporting offensive behavior. The reporting procedures vary if the aggressor is a supervisor or a co-worker. The only Alcatel document to specify complaint procedures was published after the alleged assault of Alexander.

66 (1986). To make out a prima facie case, the plaintiff "must prove: (1) that [s]he was harassed because of [her] sex; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." *Hartsell*, 123 F.3d at 771 (internal citations omitted); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987).

Anderson and the other people who harassed Alexander were co-workers rather than supervisors. Thus, the harassment was "unaided" by any supervisory power granted to the offenders by the company. In such cases, the employer is only liable if it was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop the harassment. *Mikels v. City of Durham*, 183 F.3d 323, 332 (4th Cir. 1999); *see also Spicer v. Commonwealth of Virginia, Dept. of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995).[8]

## B.

In the district court, the summary judgment argument focused on the fourth element of the prima facie case, namely whether there were grounds for imputing liability to Alcatel. Alcatel argued that it was absolved of liability because it took sufficient remedial action following Alexander's complaints of harassment beginning in 1996.

---

[8]In *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court clarified the law regarding employer liability under Title VII for sexual harassment. The Court held, "[A]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at 765, *Faragher*, 524 U.S. at 807; *see also Mikels*, 183 F.3d at 331. An employer would only be "subject to" but not "automatically liable" for such an environment because not all harassment is necessarily "aided by the agency relation." 183 F.3d at 331.

When the harasser is a co-worker and not a supervisor, as stated above, the employer is only liable when it was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop the harassment. *Id.* at 332.

In opposing summary judgment, Alexander conceded that her relationship with Anderson from 1990 to 1996 was amicable. Alexander argued, however, that the company had allowed the harassment of Wheeler and Saunders to go unchecked. Had Alcatel created and enforced a vigorous sexual harassment policy, Anderson would either have been terminated or brought to heel, Alexander contended. Consequently, he would not have assaulted her in the maintenance room.[9]

The district court rejected this argument. The court wrote, "Alexander points to previous allegations against Dale Anderson that went unchecked. The issue in this case, however, is whether Alcatel responded appropriately to the unwelcome conduct of which Alexander was the subject." *Alexander v. Alcatel NA Cable Sys., Inc.*, No. 96-0637-R at 6 (W.D. Va. Aug. 8, 2001). Because it found that Alcatel "responded both promptly and effectively" to Alexander's individual complaints,[10] the district court concluded that there was no basis for imputing liability to the employer. We must disagree. In certain circumstances, an employer, whose tepid response to valid complaints of sexual harassment emboldens would-be offenders, may be liable if a vigorous response would have prevented the abuse. Under the Court's decision in *Paroline v. Unisys Corp.*, liability may be imputed to an employer under two alternative theories. 879 F.2d 100, 106 (4th Cir. 1989), *vacated and remanded on other grounds*, 900 F.2d 27 (4th Cir. 1990). First, an employer may be liable if it fails to take prompt and effective action to redress a valid complaint lodged by the plaintiff. Second, if an employer reasonably should have anticipated that the plaintiff would become a victim, but failed to take action reasonably calculated to prevent the harassment, it may be liable. To quote from *Paroline*, the law "impose[s] a duty on [the employer] to take

---

[9]An effective policy would have spared her from the offensive phone calls and the lewd postings and graffiti, she also contended.

[10]Because the district court erred in excluding from consideration the pre-1996 incidents involving other women, we have not addressed the adequacy of Alcatel's responses to Alexander's complaints. The lower court may decide to revisit its approval of Alcatel's reactions if it finds that the company's pre-1996 sexual harassment enforcement invited the attacks on Alexander. A company whose prior enforcement has been tepid may be under an obligation to take more rigorous action to check abuses that its own laxity has invited.

adequate steps to try to prevent . . . harassment, not merely to act after the event." 879 F.2d at 106.

The *Paroline* Court noted that an "employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct." *Paroline*, 879 F.2d at 107.

In the instant case, the district court should not have dismissed as irrelevant the affidavits of Wheeler and Saunders. Their testimony, when coupled with the thin record of Alcatel's sexual harassment policy, may be sufficient to impute liability to Alcatel.[11]

### CONCLUSION

For the foregoing reasons, the judgment of the lower court on the hostile work environment claim is reversed and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[11]Our holding does not mean that other complaints lodged by other employees are necessarily relevant or subject to discovery in all discrimination cases. In the instant case, discovery into the claims of other female employees is relevant because of (i) Anderson's identity as an alleged common offender, and (ii) the slender record of a pre-1996 sexual harassment policy. In all cases, the district court may set reasonable discovery limits based upon the discrete facts presented.