UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 15-2522

_____

ABIGAIL WILSON,

     Plaintiff - Appellant,

  v.

GASTON COUNTY, NC,

     Defendant - Appellee,

  and

JIM N. PUTMAN, III,

     Defendant.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Graham C. Mullen, Senior District Judge.  (3:13-cv-00058-GCM)

_____

Argued:  January 25, 2017       Decided:  April 13, 2017

_____

Before WILKINSON, MOTZ, and DIAZ, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Wilkinson wrote the opinion, in which Judge Motz joined.  Judge Diaz wrote a separate opinion dissenting in part.

_____

**ARGUED:** Sean Franklin Herrmann, VAN KAMPEN LAW, PC, Charlotte, North Carolina, for Appellant.  Paul H. Derrick, FREEMAN MATHIS & GARY, LLP, Raleigh,

North Carolina; Martha Raymond Thompson, STOTT, HOLLOWELL, PALMER & WINDHAM, L.L.P., Gastonia, North Carolina, for Appellee. **ON BRIEF:** Joshua R. Van Kampen, VAN KAMPEN LAW, PC, Charlotte, North Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Abigail Wilson raises numerous federal and state claims against her employer, Gaston County, in connection with the sexual harassment and hostile work environment she alleges she endured at the hands of her co-worker, Jim Putman.[1] The district court granted summary judgment in favor of Gaston County on each cause of action. The various claims hinge chiefly on whether Gaston County had adequate notice of the sexual harassment. Under the facts of this case we conclude that it did not.

I.

Wilson recounts the following series of events. She was hired as a paramedic with Gaston County Emergency Medical Services ("GEMS") in April 2009. In September 2010, she notified her supervisor, Captain Thomas Cleary, that she was showing signs of breast cancer and would need time off for medical treatment. Capt. Cleary recommended that Wilson apply for leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Around the same time, Wilson received her third speeding ticket within the preceding three years while driving her private vehicle during non-work hours. The terms of Gaston County's insurance policy prohibited Wilson from driving emergency vehicles until she no longer had three speeding tickets within the three-year timeframe. Her prohibition would last at least eighteen months. Wilson was fired, subject to rehiring "[a]fter driving record clears." J.A. 30.

---

[1] Wilson also raised multiple claims against Putman that were remanded to state court after judgment was rendered in favor of Gaston County.

3

Wilson appealed her termination, claiming that other employees had incurred similar driving suspensions yet were not fired. She also appealed to the Department of Labor, which concluded she was terminated in violation of the FMLA. Wilson was reinstated a week later with full backpay and agrees that she was made whole. Upon returning to work, however, Wilson claims she was held to a higher standard than other employees, targeted for corrective or disciplinary action, and subjected to the hostile work environment described below.

In December 2010, GEMS hired Putman as another paramedic. Wilson contends that Putman began harassing her eleven months later, telling her she had a "nice ass," sending her pictures of his genitals, asking for naked pictures in return, expressing his desire to kiss and have illicit forms of sex with her, and making other unwanted physical contact. This behavior persisted despite Wilson's repeated protests.

The most serious of these events occurred in December 2011. Wilson was sitting in the passenger seat of an emergency vehicle parked at a county station when Putman reached through the open vehicle door and began to tickle and grope her. When she resisted, Putman pulled her from her seat and pinned her against the side of the vehicle, proceeding to grope her breasts, pelvic area, and genitals until a co-worker approached. Then, in January 2012, Putman walked up behind her and slapped her buttocks so hard that her sunglasses and clipboard went flying. Wilson explains that both encounters left bruising either behind her right knee or on her buttocks, respectively.

In March 2012, another co-worker confronted Putman about his inappropriate behavior toward Wilson. This altercation escalated quickly and attracted the attention of

4

Captain James McConnell, who directed Wilson to file a formal complaint of sexual harassment with Human Resources. The ensuing investigation concluded that Putman had sexually harassed Wilson, and recommended that he be issued a written warning, transferred to a different shift, sent to counseling, and advised that additional violations would result in increased disciplinary action or termination. Gaston County adopted these recommendations and further suspended Putman for two shifts without pay.

In the following months, Wilson occasionally encountered Putman when their shifts would exchange keys to the emergency vehicles. Wilson claims that Putman took these opportunities to throw the keys at her, call her a "bitch," and slam his body into her as they passed to knock her off balance. When Chief Mark Lamphiear learned of their proximity, he notified Human Resources and he once again changed Putman's shift assignment to avoid future encounters.

On January 9, 2013, Wilson filed suit against Gaston County based on the foregoing events. Wilson claimed, as relevant here, that Gaston County subjected her to a hostile work environment resulting from pervasive and severe sexual harassment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* She also claimed that Gaston County unlawfully retaliated against her in violation of both the FMLA and Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by holding her to a higher standard than other employees and ignoring her repeated complaints about Putman after she was reinstated following her temporary discharge. In addition, Wilson argued that Gaston County was liable for Putman's conduct under numerous state law tort theories, including negligent retention and supervision, battery, and intentional infliction

5

of emotional distress. Gaston County strongly disputed Wilson's version of events, especially that she repeatedly notified Gaston County of the ongoing sexual harassment.

The district court granted summary judgment to Gaston County on each cause of action. Wilson appeals.

II.

The "primary objective" of sexual harassment liability is "a prophylactic one." *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)). The emphasis is "not to provide redress but to avoid harm." *See id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998). Notice is therefore a predicate of employer liability because it provides an opportunity for the employer to correct and prevent sexual harassment, and to do so sooner rather than later. Title VII, for example, was "designed to encourage the creation of antiharassment policies and effective grievance mechanisms." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).

As a result, we have repeatedly held that "an employee claiming harassment by a coworker bears significant responsibility in notifying the employer." *Howard v. Winter*, 446 F.3d 559, 570 (4th Cir. 2006). Indeed, "'an employer *cannot* be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists' under its reasonable procedures." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 674 (4th Cir. 2011) (quoting *Howard*, 446 F.3d at 567) (emphasis in original). Particularly in large entities with a great number of workers, employers are not necessarily aware of every interaction between employees and "cannot be saddled with

6

the insurmountable task of conforming all employee conduct at all times to the dictates of Title VII, irrespective of their knowledge of such conduct." *Id.* at 675 (quoting *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 711 (4th Cir. 1995) (en banc)). Even "the unpleasant nature of reporting harassing conduct does not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Howard*, 446 F.3d at 570 (internal quotation marks omitted).

This does not mean employers can assume a mentality of "see no evil, hear no evil." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc). In fact, "an employer may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." *Id.* By establishing an environment hospitable to reporting, employees are encouraged to come forward, sexual harassment can be prevented sooner rather than later, and employers will not be burdened with liability for conduct of which they were unaware.

III.

Wilson claims that Gaston County subjected her to a hostile work environment and retaliated against her in violation of the FMLA and ADA. She also claims that Gaston County is liable for Putman's sexual harassment under the numerous state law tort theories noted above. Although each claim is distinct, the underlying issue is whether Gaston County had sufficient notice of the alleged sexual harassment to sustain liability. We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of Wilson as the non-moving party. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 419–20 (4th Cir. 2014).

7

## A.

To prevail on a claim of hostile work environment, Wilson must show that she endured harassment that was (1) unwelcome, (2) based on her sex, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to her employer. *Freeman*, 750 F.3d at 420; *Ocheltree*, 335 F.3d at 334–35; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993). Because Putman was not Wilson's supervisor, Gaston County is only liable if it "knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *Freeman*, 750 F.3d at 423 (internal quotation marks omitted). In other words, Gaston County is liable if it was negligent in responding to co-worker sexual harassment after receiving actual or constructive notice of the same. *Howard*, 446 F.3d at 567; *Mikels v. City of Durham*, 183 F.3d 323, 329 n.4, 332 (4th Cir. 1999); *see Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013).

Wilson fails to allege sufficient facts for a reasonable jury to conclude that Gaston County had adequate notice of Putman's sexual harassment, or that Gaston County responded unreasonably once it was aware of the hostile work environment. Wilson advances numerous theories by which Gaston County was on notice, which we shall address in turn.

8

First, Wilson claims that she disclosed Putman's behavior to her supervisors, Lieutenant Travis Adams[2] and Capt. McConnell, beginning in November 2011. She allegedly informed them of the illicit text messages, unwanted touching, and bruises Putman left on her thigh and buttocks. She explains that Lt. Adams and Capt. McConnell indicated they would handle the situation and that she should not report anything to Chief Lamphiear or Human Resources. Wilson also reports that she repeatedly pleaded to be transferred away from Putman, but nothing happened. The unwanted touching and illicit pictures continued.

Unfortunately for Wilson, her allegations are in conflict with her own prior statements. In March 2012, Wilson prepared a signed, handwritten complaint in connection with the formal Human Resources investigation into Putman's behavior. Her account conveys over and over both that she intentionally refrained from disclosing the details of her situation and her reasons for doing so. She explained,

> I did not feel comfortable complaining because of my history at GEMS, [because] I knew Jim was the only source of income for his wife and small child and [because] I just did not want to rock the boat.

Supp. JA 4. And again,

> I learned that Jim's wife was pregnant with twins which only furthered my resolve to try to put up with it for his family's sake even at the detriment of my own family.

Supp. J.A. 4. And again,

---

[2] The parties dispute whether Lt. Adams was a supervisor capable of receiving notice for Gaston County. Resolving that dispute is not necessary to our decision.

> I see now that I should have reported everything but I thought I was doing what was best for my career, GEMS, our shift and Jim's family. . . . I feel bad that it had to happen the way it did in order for everything to be brought into the open. But due to my own fear, my non-confrontational personality and my worry for Jim's wife and kids I don't know that I would have . . . come forward. . . . I now regret keeping quiet and wished that I would have come forward on that first day. But hindsight is 20/20 and I can't undo it.

Supp. J.A. 7–8.

Wilson later signed a typed summary of her statement, explaining that when the harassment started she "more or less laughed it off due to the nature of what was happening." Supp. J.A. 9. After the harassment escalated, she once more recounted,

> I realize that at this time I should have come forward and complained but I did not. . . . I did not want to file a complaint due to the fact of I did not want a confrontation but also because I have met Jim's wife and I know that she is a very nice woman and I also knew that they had a small child and I did not want his wife to be hurt or for Jim to possibly lose his job, thereby losing all income for his family. . . . My plan was to just try and ignore it and hope that it went away. . . . I acknowledge that I probably should have made a bigger effort to report this problem to Human Resources but I was truly trying not to rock the boat and I was attempting to avoid causing any pain to Jim's wife and child, I was uncomfortable making this type of complaint and causing a problem of this magnitude. I also knew that making a complaint of this nature would have caused multiple conflicts on this shift and killed morale. I realize now that burying my head in the sand and hoping the problem would go away was not the proper way to approach this problem. I thought that by telling Jim to stop repeatedly and telling him that it bothered me and my husband was sufficient in handling of it but I know now that it was not. . . . At the time I thought I was doing what was best for Jim's family and my own.

Supp. J.A. 9–11.

When co-workers would comment on Putman's behavior, Wilson said that she "would just shrug and walk away." Supp. J.A. 3. She wrote, "I had told them all that my intention was to just try and ignore it and pray that it stopped." Supp. J.A. 3. Wilson's

10

husband was likewise angry, but Wilson "explained [her] position on not wanting to complain" and he "agreed to stay home." J.A. 2, 10. The first mention in Wilson's account of reporting Putman's conduct to any of her supervisors is a conversation with Captain Billy Mitchell on February 28, 2012. But even then, Wilson only did so because a co-worker insisted and she admits that she "did not go into much detail." Supp. J.A. 4. Wilson simply requested not to be partnered in an emergency vehicle with Putman, and her request was granted.

We cannot ask a jury to resolve Wilson's claims by deciding between her own inconsistent statements. We have consistently held that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *see, e.g.*, *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 422 (4th Cir. 2014). A genuine issue of material fact is something on which the parties disagree, not on which one party is internally contradictory.

Wilson insists that her handwritten and typed statements catalogue reluctance to file a formal complaint with Human Resources, not a general failure to report Putman's conduct to her supervisors. In support, Wilson submitted a signed declaration to the district court making this distinction. Wilson additionally points to a phrase in her prior typed statement quoted above explaining that she "probably should have made a bigger effort to report this problem *to Human Resources*." Supp. J.A. 11 (emphasis added).

Review of both Wilson's handwritten and typed statements tell a different story. Notably missing is any indication that she disclosed the situation to her supervisors prior

11

to her conversation with Capt. Mitchell and her complaint to Human Resources one week later. Furthermore, not once does Wilson mention text messages with illicit pictures or that Putman groped her breasts, pelvis, and genitals after pulling her from the emergency vehicle. Human Resources subsequently based its finding of sexual harassment on allegations or admissions of poking, tickling, periodic text messages, "inappropriately touching Mrs. Parton [Wilson] on her knee," and bruising her leg. J.A. 85–86. Both Wilson's handwritten and typed statements are replete with and even exemplify a common theme that she generally refused to report what was happening to avoid confrontation and to protect Putman's family.

We are concerned, moreover, that this attempted distinction between reporting to supervisors and filing a formal complaint was submitted to the district court only after Gaston County filed a motion for summary judgment, over three years after Wilson's statements quoted extensively above, and over two years after she commenced legal proceedings. There is a limit to how much law can allow a party to switch or distinguish earlier statements that prove problematic later in litigation. At all times, Wilson's allegations conflict with her own provided reasons for not reporting Putman's behavior and for discouraging her co-workers and husband from doing the same.

2.

Second, Wilson claims that even if actual or constructive knowledge was initially insufficient, Gaston County was definitely on notice following the Human Resources investigation that concluded Putman was sexually harassing her. She explains that Gaston County nevertheless failed to take adequate remedial action, allowing Putman an

12

opportunity to throw his keys at her, call her a "bitch," and physically assault her. Wilson contends that leaving Putman in a position where he could continue to interact with Wilson was alone sufficient to establish a hostile work environment, yet when she reported her ongoing problem to Lt. Adams he simply told her to "put on her big girl pants and deal with it." J.A. 16.

Nevertheless, Wilson overlooks the fact that "[b]ecause there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist." *Xerxes*, 639 F.3d at 669–70 (quoting *Adler v. Wal-mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)); *see Mikels*, 183 F.3d at 330 ("We have not required that particular remedial responses be the most certainly effective that could be devised . . . ."); *Spicer*, 66 F.3d at 710 ("[W]e have never suggested that an employer must make the most effective response possible and we have consistently held that an employer is only liable for sexual harassment committed by its employees if no adequate remedial action is taken . . . ."). "[T]he mere fact that harassment reoccurs in the workplace, either by the same offender or different offenders, does not, *ipso facto*, allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment." *Xerxes*, 639 F.3d at 669.

Even were we to take Wilson's allegations to be true, that still does not suffice to establish Gaston County's liability. We have explained that "[t]here is no 'exhaustive list' or 'particular combination' of remedial measures or steps that an employer need employ to insulate itself from liability." *See id.* (quoting *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 178 (4th Cir. 2009)). Instead, "responses that have been held reasonable have

13

often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral and written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination." *Id.* at 670 (quoting *Adler,* 144 F.3d at 676–77).

Once Wilson reported Putman's conduct to Human Resources, Gaston County's response was immediate and decisive. Putman was suspended without pay, issued a written warning, transferred to a different shift, sent to counseling, and advised that further misconduct would result in increased discipline or termination. Although she disputes the ultimate efficacy of Gaston County's determined response, Wilson actually conceded that transferring Putman's shift was the appropriate remedy. *See* J.A. 612. And again, Wilson's handwritten and typed statements do not convey the same egregious behavior she now asserts.

Finally, when Gaston County learned that Putman's new shift occasionally overlapped with Wilson's, it took immediate steps to resolve that issue as well. Chief Lamphiear ordered another shift transfer to avert any future encounters.

3.

Third, Wilson claims that Gaston County had adequate notice of Putman's behavior because Lt. Adams and Capt. McConnell witnessed additional harassment on multiple occasions during workplace meetings. She specifically recounts that Lt. Adams and Capt. McConnell watched as Putman pulled her hair and poked her.

14

Even assuming Lt. Adams and Capt. McConnell witnessed this behavior, Wilson described the conduct as "childish messings" and "things you see second graders doing to each other." J.A. 596. As inappropriate or unbecoming as it may be, such workplace behavior falls short of sexual harassment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)); *id.* ("[J]udicial standards for sexual harassment must 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" (quoting *Faragher*, 524 U.S. at 788 (internal quotation marks omitted))).

4.

Fourth, Wilson claims that Gaston County had constructive notice of Putman's sexual harassment because he had engaged in this type of behavior previously. Putman was fired from his previous job for throwing his keys at a female supervisor and calling her a "bitch." After arriving at GEMS, he was disciplined for creating a hostile work environment for another employee. Wilson also recounts in detail how a fellow co-worker, Jessica Coe Spurrier, had to "punch" Putman in the stomach to keep him from kissing her. J.A. 138.

These particular incidents were insufficient to put Gaston County on notice for the type of behavior Wilson now alleges. While the actual circumstances of Putman's

15

previous dismissal remain murky or speculative, they are more revelatory of a volatile temperament than of a propensity to engage in sexual harassment. And Putman's previous written warning for creating a hostile work environment was not on the basis of sexual harassment, either. *See* J.A. 157. As to Spurrier, she referred to the encounter as "more annoying than anything" and did not find it necessary to file an actual complaint. J.A. 91–92. Spurrier only asked to not be partnered with Putman in the future and her request, too, was granted. She confirmed there were no further issues.

In sum, by Wilson's own account, Gaston County was not clearly notified of what are now Wilson's allegations. When it did receive notice, it responded proactively in an effort to prevent an unwelcome recurrence. Further, Gaston County had a reasonable sexual harassment policy and provided annual training whereby employees were explicitly encouraged to report alleged violations. While we do not suggest that such a policy alone operates to foreclose employer liability, it does weigh measurably in the balance. "The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." *Xerxes*, 639 F.3d at 669 (alteration in original) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187 (4th Cir. 2001)). The record shows that when Gaston County was made aware of alleged sexual harassment by Putman, it took immediate steps to investigate and remedy the situation. This is not the case of a careless or calloused entity that discourages reporting or otherwise turns a blind eye to a hostile work environment.

16

B.

We now turn to Wilson's other claims. To prevail on a claim of retaliation in violation of the FMLA or ADA, Wilson must show (1) that she engaged in protected conduct under either statute, (2) that Gaston County took adverse action against her, and (3) that the adverse action was casually connected to the protected conduct. *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (FMLA retaliation); *Rhoads v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001) (ADA retaliation); *see* 29 U.S.C. § 2615 (FMLA retaliation); 42 U.S.C. § 12203(b) (ADA retaliation). Wilson alleges that she was held to a higher standard and disciplined more frequently than other employees after she requested medical leave for cancer treatment in September 2010, and that Gaston County also refused to address her complaints of sexual harassment as a result.

Wilson largely concedes, however, the misconduct for which she received written warnings, including taking unauthorized leave, text messaging while on active EMS response, professional misconduct, and failure to follow medical protocol. Moreover, her first written warning came almost a year after she notified Capt. Cleary of her medical situation. Gaston County also introduced undisputed evidence that supervisors were universally instructed to scrutinize employee performance, such that many of Wilson's co-workers received substantially more written warnings than she did. The district court was correct to observe that "reprimands and poor performance evaluations occur with some frequency in the workplace[ and] are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent." *Adams*, 789 F.3d

17

at 431. Furthermore, because Wilson fails to show that Gaston County was adequately aware of Putman's sexual harassment, or that it failed to respond reasonably once it was notified, Gaston County cannot be said to have allowed a hostile work environment to persist in retaliation for Wilson's request for medical leave.

C.

Wilson finally claims that Gaston County is liable under North Carolina state law for negligent retention and supervision, battery, and intentional infliction of emotional distress. She contends that Gaston County was negligent in its response to Putman's conduct, or later ratified his behavior by refusing to adequately address the hostile work environment he created. Because intentional sexual harassment is beyond the scope of normal employment, each claim requires Wilson to show that Gaston County had actual or constructive notice of Putman's behavior and then failed to take reasonable remedial action. *See Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990) (negligent retention and supervision); *Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 235–36 (N.C. Ct. App. 1989) (respondeat superior liability for torts); *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 121–22 (N.C. Ct. App. 1986) (same). Especially when invoking respondeat superior for a battery or intentional infliction of emotional distress, Wilson must demonstrate "that the employer had knowledge of all material facts and circumstances relative to the wrongful act." *Hogan*, 340 S.E.2d at 122.

As we have discussed at length, Wilson has failed to present an issue of triable fact that Gaston County had sufficient notice or failed to respond reasonably once it did become aware of Putman's inappropriate behavior. Wilson's own statements reveal her

18

intention not to make known the nature of her hostile work environment allegations. While her reasons for non-disclosure may have been altogether laudable, they afford no basis for holding a company liable for sexually harassing conduct of which it was not even aware. Once again, when Gaston County did learn of Putman's sexual harassment, it took immediate steps to discipline and transfer him. The County could not be negligent or held to "ratify" alleged conduct when it was unaware of the sexual harassment and then took prompt steps to remedy the situation.

## IV.

For the foregoing reasons, the judgment is

AFFIRMED.

DIAZ, Circuit Judge, dissenting in part:

I agree that the district court correctly granted summary judgment in favor of Gaston County on Abigail Wilson's FMLA and ADA claims. But because a reasonable jury could conclude that the County (1) knew that Wilson was being sexually harassed by her co-worker Jim Putman and yet did nothing, or (2) reasonably should have anticipated that (based on his prior behavior) Putman would sexually harass Wilson and failed to prevent it, I would vacate the district court's grant of summary judgment to the County on Wilson's Title VII hostile work environment claim and her state law tort claims. I therefore respectfully dissent from Parts III.A and III.C of the majority opinion.

I.

We review a district court's grant of summary judgment de novo. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001). Summary judgment is appropriate only if the movant—here, Gaston County—shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* at 568 (internal quotation marks omitted). And "[a] fact is material if it might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "When reviewing a grant of summary judgment, we view all reasonable inferences drawn from the evidence in the light that is most favorable to" Wilson, as the non-moving party. *Smith v. Munday*, 848 F.3d 248, 251 (4th Cir. 2017) (internal quotation marks omitted). Critically, "[s]ummary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs*, 780 F.3d at 568.

The court's decision today contravenes our limited and well established role at the summary judgment stage of identifying genuine disputes suitable for trial. By discrediting Wilson's competent evidence and resolving factual disputes in favor of the County, the majority—as the district court did—impermissibly transforms "a motion designed simply for identifying trial-worthy issues" into "a vehicle for resolving trial-worthy issues." *Id.* at 569 n.8 (quoting Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 NYU L. Rev. 286, 312 (2013)).

## II.

Wilson's Title VII hostile work environment claim turns on whether the County had notice of Putman's sexual harassment of Wilson before March 2012, when the

County's Human Resources department conducted an investigation into the matter, substantiated Wilson's claim of harassment, and recommended that Putman be disciplined. Because Putman was Wilson's coworker, and not her supervisor, his actions are imputable to the County only if it "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc). Under this standard for assessing coworker sexual harassment, "[k]nowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Id.* (internal quotation marks and alterations omitted).

In my view, a reasonable jury could conclude that Wilson repeatedly put her supervisors on notice about Putman's sexual harassment before March 2012, and yet they failed to take effective action to stop it. And separately, a reasonable jury could conclude that Jessica Spurrier's October 2011 report to those supervisors about Putman's earlier behavior toward her placed the County on notice of Putman's penchant for sexually harassing conduct.

## A.

Since filing suit, Wilson has steadfastly maintained that she reported Putman's sexual harassment to her supervisors before March 2012, shortly after the harassment began in November 2011. In her first amended complaint, Wilson alleged that in response to these reports, "Adams and McConnell . . . told [Wilson] that they would

22

handle the matter 'internally' and discouraged her from going to Human Resources." J.A. 15.

Wilson provided additional detail about these reports in her August 2014 deposition, explaining that she reported Putman's misconduct to either Adams or McConnell between November 2011 and January 2012. According to her testimony, Wilson first approached Adams about Putman's sexual harassment in late November 2011. Wilson expressed to Adams her wish that Adams "would just do better" to keep Putman and Wilson separated, explaining,

> [Putman]'s not leaving when he's posting. He's sitting. He's waiting on me. He's still aggravating me and texting me. Just, you know, stop posting him down there. Post somebody else.

J.A. 522–23, 525. Wilson subsequently approached McConnell in December 2011 to report the incident during which Putman pulled Wilson from an ambulance, pinned her against the vehicle, and groped her breasts, pelvic area, and genitals while Wilson repeatedly told him to stop. According to Wilson,

> I told [McConnell] about the incident down there where [Putman] groped me and left a bruise on my leg.

J.A. 525.

As the majority recounts, in January 2012, Putman walked up behind Wilson during a work shift and slapped her buttocks so hard that Tina Beheler, a fellow paramedic present during the incident, "heard the pop [slap] and saw the swing." J.A. 247. Wilson again approached Adams after this second incident, stating,

23

You know, I've had two incidents now where [Putman]'s left bruises on me that I'm having to explain to my husband. My husband wants to come down here. I'm getting text messages all the time. I want him to leave me alone.

J.A. 523. Wilson further testified,

I told [Adams] about the continued text messaging. I couldn't be at the hospital at the same time that Mr. Putman was at the hospital without him coming straight for me and touching me, putting his arm around me, pulling my hair, what -- you know, what have you. I said, you know, "It's getting to the point of being aggravating. I'm having to lock the ambulance doors anytime he's around because he'll come and open my door and stand in it and -- and all sorts of other things." I said, you know, "You all need to do something."

J.A. 526. During this meeting, Wilson also told Adams that Putman had sent her two pictures of his genitals via text message.

After each report, Adams and McConnell invariably responded that they would "handle it internally" and "take care of it." J.A. 522, 526, 605–06. Adams also told Wilson that she need not bring Putman's harassment to the attention of Chief Mark Lamphiear, and McConnell discouraged her from going to Human Resources.

My colleagues touch only briefly upon this deposition testimony, instead anchoring their holding on the statements signed by Wilson in connection with the March 2012 Human Resources investigation wherein, says the majority, Wilson admits that she had not reported the harassment.

To be sure, our court adheres to the "long-standing principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts." *Spriggs*, 242 F.3d at 185 n.7 (citing

24

*Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970 (4th Cir. 1990)). We first recognized this rule—often referred to as the "sham affidavit" doctrine—in *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984). *See Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 422 (4th Cir. 2014) ("This Court has previously referred to bogus affidavits submitted in opposition to summary judgment for the purpose of creating disputes of material fact as 'sham' affidavits.").

Application of the doctrine deters litigants attempting to generate issues of fact to avoid summary judgment from submitting a conclusory affidavit that contradicts *prior* deposition testimony. Central to its application is the principle that a party's deposition testimony "will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (internal quotation marks omitted); *see also Rohrbough*, 916 F.3d at 975 ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." (quoting *Barwick*, 732 F.2d at 960)).

Here, however, the majority has chosen to treat Wilson's statements to Human Resources as gospel over her later deposition testimony. Moreover, for the rule to apply "there must be a bona fide inconsistency" in the party's account of the facts. *Spriggs*, 242 F.3d at 185 n.7. Drawing all reasonable inferences in Wilson's favor, I discern no

25

"bona fide inconsistency" between the statements Wilson provided during the March 2012 Human Resources investigation and her later sworn testimony that she reported Putman's sexual harassment to her superiors as early as November 2011.

To begin with, the written statements are not necessarily inconsistent with Wilson's later deposition testimony: Wilson never states that she did *not* report Putman to Adams or McConnell or *solely* reported Putman's harassment to her peers. Moreover, a jury could find entirely reasonable Wilson's explanation that the statements merely reflect her hesitancy to escalate the matter by reporting it to Human Resources, particularly since, as she alleges, her supervisors discouraged her from doing so.

Common sense and context also support that conclusion. Human resources departments are normally separate entities from an employee's everyday chain of command. Gaston County's sexual-harassment policy and training materials reflect this distinction, instructing employees who witness sexual harassment to report misconduct to their supervisors *or* alternatively to the Human Resources Director. An employee could reasonably view bypassing her superiors and bringing a complaint of sexual harassment to Human Resources to be a discrete, more serious form of complaint. Further, Wilson wrote the statement and signed the typed summary during the Human Resources investigation into Putman's harassment, at the urging of Amia Massey, Human Resources Coordinator. In this light, it's not unreasonable to conclude that when Wilson expressed regret in the March 2012 statements for belatedly filing a "complaint *of this nature*" or "making *this type* of complaint," she was referring only to her failure to bring Putman's

26

harassment to the attention of the Human Resources Department.  Supp. J.A. 11 (emphasis added).

In sum, while a reasonable juror could reject Wilson's explanation as to the alleged discrepancies in the handwritten and typed statements and her testimony, a reasonable juror could also accept it.  In light of Wilson's detailed deposition testimony regarding her multiple reports to her supervisors, I cannot agree that, as a matter of law, the record evidence compels a conclusion that Wilson failed to inform her supervisors about Putman's sexual harassment before March 2012.

B.

In any event, if more were required to place Gaston County on notice about Putman's sexually harassing behavior, Jessica Spurrier's testimony detailing Putman's unwanted sexual advance and her subsequent report to Adams and McConnell is itself sufficient to create a jury question as to the County's constructive notice of Putman's deplorable behavior.

Spurrier, a fellow paramedic, was twice assigned to ride with Putman in Fall 2011. On those occasions, Putman "messed" with Spurrier by poking and tickling her while they sat together in a parked ambulance.  J.A. 91.  Spurrier testified in her deposition about an incident that occurred prior to October 2011, stating,

> [Putman] was in the driver's seat; I was in the passenger seat.  He repeatedly would reach over, trying to poke and tickle.  He was repeatedly told to stop.  He then came around to the side of the truck, the passenger side where I was sitting typing a report.  He continued the behavior of trying to touch and grab at my sides, bringing himself uncomfortably close

27

to my face, to a point at which I kind of had to punch him in the stomach because he was not listening to the word "no."

J.A. 138. Spurrier described the incident in further detail, testifying that despite telling Putman to stop "[a]t least two or three" times, Putman "startle[d] [her] when he opened the door" of the passenger side and continued "grabbing at [her] sides, poking, trying to tickle, and . . . continued getting closer to [her] face." J.A. 139, 142–43. As Spurrier pushed back and told Putman to stop, Putman pulled her toward him to kiss her, stopping only when she punched him in the stomach.

Spurrier reported this incident to her operational supervisors—Adams and McConnell. Spurrier told one or both of them that she did not want to ride with Putman again, explaining, "I said that he got in my personal space, tickling me, that I was uncomfortable, I didn't want to do it again." J.A. 146. Spurrier also told Adams and/or McConnell that Putman had attempted unwelcome physical contact with her, refused to listen to her when she told him repeatedly to stop, and "got the point across" that she had to subdue Putman with a punch to stop his unwanted advance. J.A. 147. According to Spurrier, her report "wasn't made a big deal" and she was never partnered with Putman again. J.A. 147.

I cannot agree with the colleagues that this troubling incident was "more annoying than anything," and thereby insufficient to put Gaston County on notice about Putman's sexually harassing behaviors. Op. at 16 (quoting J.A. 91–92). Like the district court, the majority adopts Spurrier's characterization of the incident in her affidavit, ignoring Spurrier's more detailed deposition testimony stating that Putman's behavior made her

28

"completely uncomfortable" and "would have never been said [to be] okay."  J.A. 148,

151.

Regardless, the determination of whether unwelcome, sex-based conduct is sufficiently severe as to amount to sexual harassment is an objective one, viewed "from the perspective of a reasonable person in the [victim's] position." *Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir. 2011) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).  By adhering to this objective standard, we avoid allowing a victim's subjective perceptions—which can downplay or exaggerate an incident—to govern harassment claims.

"[E]mployers have an affirmative duty to prevent sexual harassment, and will be liable if they anticipated or reasonably should have anticipated that a particular employee would sexually harass a particular coworker and yet failed to take action reasonably calculated to *prevent* such harassment."  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015) (internal quotation marks omitted)*; see also Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989) ("Prevention is generally more efficacious than cure."), *rev'd in part on other grounds*, 900 F.2d 27 (4th Cir. 1990) (en banc) (per curiam).  The appropriate inquiry then is whether the County should have *reasonably* anticipated, on the basis of Spurrier's report to Adams and/or McConnell, that Putman would have sexually harassed another female coworker.  In my view, a reasonable juror could so conclude.  As we have explained,

> An employer's knowledge that a male worker has previously harassed
> female employees other than the plaintiff will often prove highly relevant in

29

deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct. . . . Of course, an employer's knowledge of previous incidents of sexual harassment of other female workers will not necessarily indicate that an employer should have anticipated the plaintiff's harassment as well. But that is generally an issue for the fact finder, not one for disposal on summary judgment.

*Paroline*, 879 F.2d at 107 (internal citations omitted).

That Spurrier only requested that she not be partnered with Putman in the future did not relieve her employer of its affirmative duty to prevent future sexual harassment by Putman. Indeed, "[i]n certain circumstances, an employer, whose tepid response to valid complaints of sexual harassment emboldens would-be offenders, may be liable if a vigorous response would have prevented the abuse." *Alexander v. Alcatel NA Cable Sys.*, 50 F. App'x 594, 602 (4th Cir. 2002).

The incident reported by Spurrier bears striking similarities to Putman's harassment of Wilson. Putman tickled, poked, and grabbed both women, and made unwanted sexual advances toward them during work hours, while alone with them in an ambulance. And, critically, Spurrier notified her supervisors about this behavior. On this evidence, I cannot conclude as a matter of law that Spurrier's report to her supervisors failed to place Gaston County on notice that Putman would—absent a swift response—likely harass another female coworker.

III.

30

Wilson's state law tort claims of battery and intentional infliction of emotional distress ("IIED") likewise turn on whether the County had adequate notice of Putman's sexually harassing behavior prior to March 2012.  For reasons I've explained, the record evidence, properly construed, supports Wilson's assertion that the County had knowledge of all material facts and circumstances surrounding Putman's conduct before March 2012.  As such, a reasonable jury could conclude that the County "ratified" Putman's intentional torts when it failed to act to correct his behavior.  *See Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 235–36 (N.C. Ct. App. 1989).[*]

In support of its finding that the County lacked "knowledge of all of the material facts surrounding a battery Putman committed at any time before March 2012," the district court concluded that Wilson's reports to Adams that Putman was "sending [her] home with bruises" and to McConnell that Putman "left a bruise on her," were insufficient to convey that Putman had committed a battery.  J.A. 108.  Even absent the reasonable inference that Wilson reported to McConnell the specific details of the December 2011 incident during which Putman groped Wilson against an ambulance, it

---

[*] Similarly, the County's actual notice of Putman's tendency to engage in sexually harassing and tortious conduct towards other female coworkers prior to Putman's harassment of Wilson satisfies the notice element of Wilson's state law claim for negligent retention and supervision.  *See Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990).  Construing the record evidence in Wilson's favor, a reasonable jury could conclude that, given its knowledge of Putman's prior, similar tortious conduct, the County was negligent in its retention and supervision of Putman.  *See Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 124–25 (N.C. Ct. App. 1986).  Accordingly, I would vacate the district court's entry of summary judgment against Wilson as to her negligent retention and supervision claim.

31

strains credulity to conclude—on the basis of these comments—that Adams and McConnell were unaware that Putman had committed a non-consensual "offensive touching of" Wilson. *See Holleman v. Aiken*, 668 S.E.2d 579, 592 (N.C. Ct. App. 2008).

The district court also entered judgment for the County on Wilson's IIED claim for lack of notice, finding that Wilson's reports to her supervisors did not sufficiently convey that she was experiencing extreme emotional distress. But Wilson reported to Adams and McConnell that Putman subjected her to non-consensual sexual touching, constant suggestive remarks, and graphic text messages. Wilson also told Adams that she had taken to locking herself in the ambulance to avoid further harassment from Putman. Under North Carolina law, such conduct could be regarded by a jury to be "beyond the bounds usually tolerated by decent society." *Hogan*, 340 S.E.2d at 121 (internal quotation marks omitted). Summary judgment on Wilson's intentional infliction of emotional distress claim was therefore improper. *See Wilson v. Bellamy*, 414 S.E.2d 347, 359 (N.C. Ct. App. 1992) ("[O]nce conduct is shown which may be reasonably regarded as extreme and outrageous, it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability." (quoting *Brown*, 378 S.E.2d at 235)).

\* \* \*

For the reasons given, I respectfully dissent from Parts III.A and III.C of the majority opinion.